STATE, Respondent, v. TEXACO, INC., Appellant.

*October 4—November 17, 1961.*

For the appellant there were briefs by *Amzy B. Steed* and *James W. Campbell,* both of New York City, and *Foley, Sammond & Lardner* of Milwaukee, attorneys, and *Kaye, Scholer, Fierman, Hays & Handler* of New York City of counsel, and oral argument by *Mr. Steven E. Keane* of Milwaukee, and *Mr. Steed.*

For the respondent the cause was argued by *George F. Sieker* and *George B. Schwahn,* assistant attorneys general, with whom on the brief was *John W. Reynolds,* attorney general.

DIETERICH, J. Texaco in support of the demurrer contends that the complaint fails to state a cause of action because there has been no determination made by the department of agriculture that Texaco has violated a department order. It further contends that orders secs. Ag 112.01 and Ag 112.03, 1 Wis. Adm. Code, adopted by the department of agriculture pursuant to sec. 100.20 (2), Stats., are unconstitutional in their application to Texaco because of an alleged conflict with congressional policy as expressed in the Robinson-Patman Act and that proceedings instituted by the federal trade commission under the Robinson-Patman Act in Virginia preclude this state from also prosecuting for allegedly similar violations in Milwaukee.

We find no merit in the defendant's contention that the state of Wisconsin is precluded from bringing the action. General orders of secs. Ag 112.01 [1] and Ag 112.03,[2] 1 Wis.

[1] Ag 112.01 "REBATES. No wholesaler of gasoline who sells gasoline to retailers thereof shall pay to any such retailer a so-called 'commission' which is in reality a rebate off the purchase price; no wholesaler of gasoline shall, by any other device of like effect, discriminate in the price at which such wholesaler sells gasoline to retailers thereof."

[2] Ag 112.03 "DISCRIMINATION. No wholesaler of gasoline shall enter into any agreement or arrangement whereby discrimination is made in the price at which said wholesaler sells gasoline to retailers thereof, where the effect of such discrimination may be to substantially lessen competition or to tend to create a monopoly in the marketing of gasoline in the community in which said wholesaler is thus selling at lower price; provided, that it shall be a justification for such a discrimination in price if the difference, made by said wholesaler in the price to the retailer to whom said

Adm. Code, became a part of sec. 100.20, Stats.,[3] upon their adoption by the Wisconsin department of agriculture. The action was commenced pursuant to secs. 100.24 (3),

wholesaler sells at the lower figure, is merely commensurate with an actual difference in the quality or quantity of gasoline sold to said retailer or in the transportation charges or other expense of marketing involved in the sale to said retailer."

[3] "100.20 METHODS OF COMPETITION AND TRADE PRACTICES. (1) Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited.

"(2) The department, after public hearing, may issue general orders forbidding methods of competition in business or trade practices in business which are determined by the department to be unfair. The department, after public hearing, may issue general orders prescribing methods of competition in business or trade practices in business which are determined by the department to be fair.

"(3) The department, after public hearing, may issue a special order against any person, enjoining such person from employing any method of competition in business or trade practice in business which is determined by the department to be unfair. The department, after public hearing, may issue a special order against any person, requiring such person to employ the method of competition in business or trade practice in business which is determined by the department to be fair.

"(4) The attorney general may file a written complaint with the department alleging that the person named therein is employing unfair methods of competition in business or unfair trade practices in business or both. Whenever such a complaint is filed it shall be the duty of the department to proceed, after proper notice and in accordance with its rules, to the hearing and adjudication of the matters therein alleged, and the attorney general may appear before the department in such proceedings. He shall be entitled to judicial review of the decisions and orders of the department as provided in chapter 227.

"(5) Any person suffering pecuniary loss because of a violation by any other person of any order issued under this section may sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss, together with costs, including a reasonable attorney's fee."

(4) [4] and 280.02, Stats.,[5] which authorize the enforcing of the provisions of sec. 100.20, Stats.

The conflict between the federal and state statute, if any, cannot be considered in the abstract. The defense must plead specific facts and parties when it alleges a defense based on a conflict of federal and state policy. Until this court knows what the facts are it cannot determine whether a conflict, if any, exists. The question of conflict is moot until it is presented in a factually concrete manner. Because of the alleged conflict with the Robinson-Patman Act, 15 USCA, sec. 13 (p. 104, pocket part),[6] it is of the utmost im-

---

[4] "100.24 REVOCATION OF CORPORATE AUTHORITY; OUSTER. . . .

"(3) Any foreign corporation which shall violate any order issued under sec. 100.20, . . . shall, upon proof thereof, in any court of competent jurisdiction, have its license or authority to do business in this state canceled.

"(4) Upon complaint being made to the attorney general and evidence presented to him which shall satisfy him that any foreign corporation has violated any order issued under sec. 100.20, . . . he shall forthwith bring an action in the name of the state to have the license or authority of such corporation to do business in this state canceled, and to oust such corporation from all business of every kind and character in this state."

[5] "280.02 INJUNCTION AGAINST PUBLIC NUISANCE, TIME EXTENSION. An action to enjoin a public nuisance may be commenced and prosecuted in the name of the state, either by the attorney general upon his own information, or upon the relation of a private individual, or a county, having first obtained leave therefor from the court. . . . No stay of any order or judgment enjoining or abating, in any action under this section, may be had unless the appeal be taken within five days after notice of entry of such judgment or order or service of the injunction. Upon appeal and stay, the return to the supreme court shall be made immediately."

See *State ex rel. Abbott v. House of Vision* (1951), 259 Wis. 87, 47 N. W. (2d) 321.

[6] "(a) It shall be unlawful for any person engaged in commerce, . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in

portance that the pertinent facts be brought as fully into the record as possible before a decision is reached.

The federal case in Virginia is pending and if at all applicable must be pleaded as a matter of defense. The factual basis of the defense is not before us however, because in the instant case no answer has been filed or evidence submitted. Whether these cases are in fact prosecution for the same violation cannot be decided in a factual vacuum. This state is not precluded from the exercise of its police power on the mere possibility that a conflict of jurisdiction exists with the federal government; such conflict must be factually verified.

The constitutionality of a statute may be raised by a general demurrer where a cause of action depends on that statute. *Ocean Accident & Guarantee Corp. v. Poulsen* (1943), 244 Wis. 286, 12 N. W. (2d) 129.

However, whether or not this court, when confronted with an issue of the constitutionality of a statute, will require a judicial investigation through trial of facts, or whether it will inform itself through independent research and the taking of judicial notice, is something that lies

---

any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: . . .

"(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the *prima facie* case thus made by showing justification shall be upon the person charged with a violation of this section, . . . *Provided, however,* That nothing herein contained shall prevent a seller rebutting the *prima facie* case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor "

entirely within the court's sound discretion. *Associated Hospital Service v. Milwaukee* (1961), 13 Wis. (2d) 447, 473, 109 N. W. (2d) 271.

The validity or invalidity of the statute in this case is dependent upon facts other than those of which the court can take judicial notice. To make a determination on the constitutionality of a regulation statute like sec. 100.20, the court must determine whether propositions which the legislature deemed to be facts, and upon which it presumably based its decision to legislate, may be reasonably conceived (as facts) in the mind of the court. *Ritholz v. Johnson* (1944), 244 Wis. 494, 12 N. W. (2d) 738.

A statute will be held constitutional unless the court can say that no state of facts can reasonably be conceived that would sustain it. *State v. Neveau* (1941), 237 Wis. 85, 294 N. W. 796, 296 N. W. 622. The burden rests with the party challenging a statute to negate every conceivable basis which may reasonably support the statute's constitutionality. Texaco has not met this burden.

We hold that the complaint states facts sufficient to state a cause of action under the provisions of secs. 100.24 (3), (4) and 280.02, Stats. An answer is required so that evidentiary facts may be produced at the trial level. This court and the trial court will then have relevant evidentiary facts now denied to it. *White House Milk Co. v. Reynolds* (1960), 12 Wis. (2d) 143, 106 N. W. (2d) 441.

*By the Court.*—Order affirmed. The defendant to be granted twenty days from the return of the remittitur to file an answer.

FAIRCHILD, J. (*concurring in the result*). (1) *Conflict with federal law.* Texaco argues that there is a conflict between the Robinson-Patman Act [1] forbidding price discrimination in interstate commerce (hereinafter referred to

[1] 15 U. S. Code, sec. 13.

as the "federal act") and secs. Ag 112.01, 112.03, and 112.04, 1 Wis. Adm. Code (hereinafter referred to as the "Wisconsin regulation"). Texaco disclaims any contention that the federal act pre-empts the field of regulation of price discrimination where interstate commerce is involved, and concedes that if the Wisconsin regulation were entirely consistent with the federal act, the former could properly operate concurrently with the federal act.[2] But Texaco claims that the differences between them are so substantial that since interstate commerce is involved, the Wisconsin regulation is superseded.[3] The attorney general argues, however, that there is no conflict and no substantial difference between the federal act and the Wisconsin regulation. Counsel do not agree on the proper interpretation of the language of portions of the Wisconsin regulation and of the federal act, where different.

Texaco tells us that the ultimate test for conflict between state and federal law is whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress." [4]

Texaco perceives two substantial differences between the Wisconsin regulation and the federal act. The one which it stresses as the more important is the presence in the federal act of a defense sometimes referred to as the good-faith-meeting-competition defense.[5] It claims that many acts of

___

[2] *State v. Allied Chemical & Dye Corp.* (1960), 9 Wis. (2d) 290, 101 N. W. (2d) 133.

[3] Clause 2, art. VI, U. S. Const., the "supremacy clause."

[4] *Hines v. Davidowitz* (1941), 312 U. S. 52, 67, 61 Sup. Ct. 399, 85 L. Ed. 581.

[5] Robinson-Patman Act, *supra,* footnote 1, sec. 13: "Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the *prima facie* case thus made by showing justification shall be upon the person charged with a violation of this section, . . . *Provided, however,* That nothing herein contained shall prevent a seller rebutting the *prima facie* case thus made by showing that his lower price or the furnishing

price discrimination which would be unlawful if the Wisconsin regulation were applied would be lawful under the federal act if they occurred under such circumstances that the good-faith-meeting-competition defense could be proved. Counsel do not agree as to the applicability of the defense to some types of transactions, and indicate that there is disagreement among the federal courts and the federal trade commission.[6]

A second difference claimed is that under the Wisconsin regulation, it is unlawful to charge different prices for different grades of gasoline unless the difference can be justified on the basis of cost, but under the federal act a difference in prices of different grades need not bear any relationship to the difference in value of the goods.

Although it must be conceded that the terms of the Wisconsin regulation and of the federal act are different in certain respects, both have the general purpose of preventing price discrimination where its effect may be substantially to lessen competition or tend to create a monopoly. Presumably there are, or could be if the regulation and act did not exist, a great many acts of price discrimination which are or would be violations of both.

Let us assume that as Texaco claims there may be acts of price discrimination under circumstances such that they would be unlawful under the Wisconsin regulation but lawful, by reason of the good-faith-meeting-competition defense, under the federal act. Let us also assume that this is the type of conflict which must not exist under the supremacy clause. Texaco would avoid the conflict by suspending the entire Wisconsin regulation. It might, however,

of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

[6] *Sun Oil Co. v. Federal Trade Comm.* (5th Cir. 1961), 294 Fed. (2d) 465; *Enterprise Industries v. Texas Co.* (D. C. Conn. 1955), 136 Fed. Supp. 420, reversed on other grounds, 240 Fed. (2d) 457.

be possible to avoid it by suspending the Wisconsin regulation only as to transactions where the conflict exists. I am not prepared at this time, simply by looking at the face of the federal act, to say that the Wisconsin regulation is so disruptive of the objectives of the federal act, that it is wholly suspended and inoperative. Particularly because of the complexity of economic regulation, I prefer to reserve judgment until the record before us shows the type of price discrimination being practiced and the extent to which defenses available under the federal act and not under the Wisconsin regulation can be proved. Not only will the existence of any conflict then be made more clear, but the record will doubtless provide a better groundwork for evaluation of the substantiality of the conflict.

2. *Pendency of federal trade commission proceeding.* The circuit court took judicial notice of a complaint issued by the federal trade commission against Texaco September 27, 1957, and concededly still pending. This complaint charges Texaco with discriminating in price between different purchasers of its gasoline of like grade and quality. The sales involved are alleged to have been made "to certain dealers located in and around the Portsmouth-Norfolk-Virginia Beach, Virginia, area, and other areas. . . . This practice of respondent has been followed in other areas of the United States as well as the afore-mentioned Norfolk-Portsmouth-Virginia Beach, Virginia, area." The complaint closes with a notice of hearing as to why an order should not be entered requiring Texaco to cease and desist from the violations charged. The practices being attacked in the federal administrative proceeding may be, but are not necessarily, similar in substance to those under attack in this action.

Texaco relies upon dictum in *Ritholz v. Ammon*[7] that "if it appeared that the federal trade commission had already taken jurisdiction over the practices sought to be

---

[7] (1942), 240 Wis. 578, 591, 4 N. W. (2d) 173, 178.

dealt with by the state department of agriculture, a conflict might exist because both departments would be attempting to deal with the same conduct of plaintiffs. In such a situation, no doubt, the state would have to yield." Reliance is also placed on decisions in the field of administrative regulation of labor relations affecting interstate commerce.[8] It does not seem to me that congressional provision for administrative determination of the occurrence of violation of a law nor the actual commencement of a quasi-judicial proceeding to make such determination necessarily excludes state enforcement of the state law governing the same conduct, if the state and federal laws are not in material conflict. The greater the degree of discretion as to policy delegated by the congress to the administrative agency, the more likely concurrent state enforcement would be to disrupt or interfere with the purposes of the congress, but the more closely the federal administrative procedure is confined to a quasi-judicial determination of the facts as to violation and application of a consequence prescribed by law, the more reasonable it is to conclude that concurrent state enforcement of a consistent state law is acceptable to the congress.

It seems to me that the federal trade commission proceeding has the character of a quasi-judicial proceeding for enforcement of the federal act and that if the Wisconsin regulation is sufficiently consistent with the federal act so that the Wisconsin regulation is not suspended, the institution of the federal trade commission proceeding does not prevent enforcement of the state regulation.

While views which may be entertained by members of the federal trade commission are not determinative of the law, the attorney general has presented letters from the chairman and secretary stating that it is the opinion of the

---

[8] *Bethlehem Co. v. State Board* (1947), 330 U. S. 767, 67 Sup. Ct. 1026, 91 L. Ed. 1234; *Garner v. Teamsters Union* (1953), 346 U. S. 485, 74 Sup. Ct. 161, 98 L. Ed. 228.

commission that the present action before the Wisconsin courts will not in any way interfere with the proceeding before the commission. The attorney general informs us that both the federal trade commission and the antitrust division of the federal department of justice have programs of fostering increased state-enforcement activity in this field in order to reduce the burden on the federal agencies. It seems desirable that this type of co-operation be approved, unless, of course, there are fundamental reasons in a particular area why it cannot be valid.[9]

3. *Equal protection of law.* Texaco argues that the Wisconsin regulation deprives it of equal protection of law and asserts that a gasoline wholesaler is the only seller who is not permitted to defend against a charge of price discrimination on the basis of good-faith-and-competitive necessity. It states that sellers prosecuted under sec. 133.17, Stats., are accorded such defense and that there are no conceivable facts "which justify singling out the petroleum industry for this special treatment in Wisconsin." We can take judicial notice of many differences between the organization of the business of distributing gasoline and other types of business. It would be presumed that imposition of unique regulations upon a distinct type of business would be reasonably related to the peculiarities of the business until the contrary clearly appears.

4. *Enforcement by court action alleged to be premature.* It is apparently conceded that the Wisconsin regulation here involved stems from sec. 100.20, Stats. Sub. (1) thereof prohibits unfair methods of competition and unfair trade practices. Sub. (2) authorizes the department to issue "general orders" forbidding methods of competition or trade practices which are determined by the department to be unfair. The regulation here involved is a general order of

[9] See *State v. Allied Chemical & Dye Corp., supra,* footnote 2, page 295.

that type. Sub. (3) authorizes the department, after public hearing, to issue a special order against any person, enjoining him from employing any method of competition or trade practice determined by the department to be unfair. Sub. (4) authorizes the attorney general to institute a proceeding leading to a special order.

Sec. 100.24 (3), Stats. 1959, provides that any foreign corporation which violates "any order" issued under sec. 100.20 shall, upon proof in a court of competent jurisdiction, have its license to do business in this state canceled. Sub. (4) requires the attorney general to bring the action; subs. (1) and (2) contain similar provisions with respect to domestic corporations.[10]

Texaco claims, apparently, that only a violation of a special order can give rise to an ouster action under sec. 100.24, Stats. It argues that the attorney general was required to proceed to obtain a special order against Texaco even though its acts were violation of a general order. I can see no basis for such an interpretation of secs. 100.20 and 100.24. Sec. 100.20 empowers the department to determine what methods and practices are unfair, as prohibited by sub. (1) thereof. It may either make such determination applicable to all persons engaging in such unfair methods or practices (a general order) or as to a particular person engaging in a particular unfair practice or method (a special order). Sec. 100.24 predicates ouster upon violation of "any order," and that would refer to any general order as well as any special order. Sec. 100.26 (3) prescribes a criminal penalty for intentional violation of "any regulation" made under sec. 100.20.

---

[10] Ch. 386, Laws of 1961, has amended subs. (1) and (3) of sec. 100.24, Stats. 1959, so that ouster is to be granted at the discretion of the court, upon equitable terms, and only upon proof of a substantial and wilful violation.

The attorney general here seeks an injunction, claiming that open, continuous, and intentional violation of law is a public nuisance and that he is authorized to bring this action for an injunction by sec. 280.02, Stats. Texaco claims the contrary, and that the concept of public nuisance does not embrace continuous violation of laws or regulations prohibiting unfair methods of competition or trade practices, unless the conduct interferes with public health, safety, or morals. While the leading cases in Wisconsin on this subject did involve activities more directly related to public morals [11] and to public health [12] than the distribution of gasoline, the language of those decisions did not so limit the concept of public nuisance, and, in my opinion, such limitation would be unsound. The policy of the state against monopoly, unfair methods of competition, and unfair trade practices is important, and continued violation of laws implementing that policy broadly affects the economic interests of the general public. Such violation does, in my opinion, constitute a public nuisance, enjoinable at the suit of the attorney general under sec. 280.02.

I concur in affirmance of the order overruling Texaco's demurrer.

I am authorized to state that Mr. Chief Justice MARTIN joins in this opinion.

HALLOWS, J. (*dissenting*). I cannot agree that jurisdiction of this action is sustained by sec. 100.24 or by sec. 280.02, Stats. Under sec. 100.24 (3) it is provided that a foreign corporation which violates any order issued under

---

[11] *State ex rel. Attorney General v. Thekan* (1924), 184 Wis. 42, 198 N. W. 729 (illegal use of property for sale of intoxicants), and *State ex rel. Cowie v. La Crosse Theaters Co.* (1939), 232 Wis. 153, 286 N. W. 707 (bank-night lotteries).

[12] *State ex rel. Abbott v. House of Vision* (1951), 259 Wis. 87, 47 N. W. (2d) 321 (illegal practice of optometry).

sec. 100.20 shall, upon proof thereof in any court of competent jurisdiction, have its license or authority to do business in this state canceled. Sub. (4) allows the attorney general to bring an action in the name of the state for such violation. The question for interpretation is the meaning of "any order issued under sec. 100.20." There are two types of orders referred to in that section. General orders by which are meant broadly applicable regulations, such as secs. Ag 112.01 and Ag 112.03, 1 Wis. Adm. Code, and special orders. General orders are antiquated by sec. 227.01 (3), Stats., to a rule or regulation, standard or statement of policy. Special orders are those that are issued by the department of agriculture after a hearing and which constitute a cease-and-desist order in enjoining a particular defendant from a method of competition considered by the department as being unfair. Sec. 100.24, Stats., under our rule, has not been used previously and is unconstrued.

It does not seem to me that the legislature intended that the business life of a corporation could be terminated and such a corporation be ousted of all business of every kind and character in this state by a suit before the administrative agency has passed upon and determined the facts to be in violation of a general order or rule which it has promulgated under the authority of this statute. Such a construction results in a complete voidance of the administrative procedure devised by the legislature and frustrates the administrative process. We do not overlook the fact that to oust a corporation from business of every kind and character in this state might prevent the defendant from engaging in interstate commerce and would raise the serious question of whether the action would violate the commerce clause of the United States constitution.

When sec. 100.20 (4), Stats., was enacted, the attorney general took the position that its enactment was necessary as an incipient step in the direction of full-fledged antitrust

suit for a violation prohibited by ch. 133, Stats. Since under the majority opinion this suit can be maintained, there will be little occasion for the attorney general for using the administrative procedure of sec. 100.20 (4). Special orders and cease-and-desist orders of the department of agriculture may well fall into disuse.

The reasonable construction of sec. 100.24, Stats., is that the administrative process should be fully utilized, and if there is a violation of a special order made by the administrative agency, then sec. 100.24 may be used. I do not believe the legislature intended any such short cut as the attorney general attempts to use in this case.

An injunction under sec. 280.02, Stats., is to be used in enjoining a public nuisance. That section gives to the attorney general upon his own information the authority to commence a suit to enjoin a public nuisance in the name of the state. The section does not define what is a public nuisance or specifically that any business methods of competition or trade practices constitute a public nuisance or may be enjoined. There is statutory authority in sec. 100.20 (3), for enjoining any person from employing any method of competition in business or trade practices which is determined by the department to be unfair, but no such determination has yet been made in this case.

The basis of enjoining a public nuisance in the absence of express statutory authority must be found in the traditional jurisdiction of equity. Beside the fact there is an adequate remedy at law under the administrative process, the complaint does not allege acts which constitute a public nuisance. The complaint is grounded on the proposition that repeated violations of any statute or regulation necessarily constitute a public nuisance. The majority relies on *State ex rel. Abbott v. House of Vision* (1951), 259 Wis. 87, 92, 47 N. W. (2d) 321. In that case, by a divided court, the majority used broad language that "acts repeat-

edly performed . . . which do violate a statute whether or not they might be lawful to other and different circumstances," constitute a public nuisance, but this language was used in relation to a statute relating to public health and the place of violation of which could be particularly offensive to the surrounding community. The court relied on *State ex rel. Attorney General v. Thekan* (1924), 184 Wis. 42, 198 N. W. 729, and *State ex rel. Cowie v. La Crosse Theaters Co.* (1939), 232 Wis. 153, 286 N. W. 707. *Thekan* involved a public nuisance in operating premises where intoxicants were manufactured and sold in violation of the United States constitution and the Wisconsin statutes. The latter, besides prohibiting such conduct, also designated the place a public nuisance. *Cowie* involved "bank nights" at a theater which was prohibited as a lottery. In both cases, the court found a public nuisance, not because of a violation of the law, but that a repeated violation of the criminal statutes was, in fact, a public nuisance. Both these cases and the *House of Vision Case* are sustained on the traditional jurisdiction of equity and on the judicial concept that a public nuisance either interferes with the use of land or of a public place or the activities constitute an interference with the interest of public health, public safety, or public morals of the community. On this traditional ground, there are many cases involving violations of liquor laws, gambling laws, construction of dangerous commercial or industrial buildings in certain locations, and interference with fishing and navigation. Many of these areas of activities relating to public health, morals, and safety are characterized as public nuisances by statute, but the facts in this complaint are not. The traditional scope of public nuisance was well stated by Professor Warren A. Seavey in 65 Harvard Law Review, 984. See also Prosser, Law of Torts (2d ed.), pp. 401–403, sec. 71.

The theory of the complaint departs from the accepted concept of public nuisance and the majority of the court now enlarges the concept of public nuisance to include violations of a regulation of an administrative agency which have no relation to public health, safety, or morals. There is no justification for such extension.