# EXXON CORP. ET AL. v. GOVERNOR OF MARYLAND ET AL.

## No. 77–10. Argued February 28, 1978—Decided June 14, 1978*

---

*Together with No. 77–11, *Shell Oil Co.* v. *Governor of Maryland et al.;* No. 77–12, *Continental Oil Co. et al.* v. *Governor of Maryland et al.;* No. 77–47, *Gulf Oil Corp.* v. *Governor of Maryland et al.;* and No. 77–64, *Ashland Oil, Inc., et al.* v. *Governor of Maryland et al.,* also on appeal from the same court.

118

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, and REHNQUIST, JJ.,

joined. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 134. POWELL, J., took no part in the consideration or decision of the cases.

*William Simon* argued the cause for appellants in all cases. With him on the briefs for appellants in Nos. 77–10, 77–11, and 77–47 were *William L. Marbury, Lewis A. Noonberg, David F. Tufaro, Robert L. Stern, J. Edward Davis, Daniel T. Doherty, Jr., Robert G. Abrams, Lawrence S. Greenwald, Bernard J. Caillouet, Richard P. Delaney, Lauric J. Cusack, Jerry Miller,* and *A. M. Minotti. Wilbur D. Preston, Jr., Stanley B. Rohd, Andrew K. McColpin,* and *Richard R. Linn* filed a brief for appellants in No. 77–12. *David Ginsburg, Fred W. Drogula,* and *James E. Wesner* filed briefs for appellants in No. 77–64.

*Francis B. Burch,* Attorney General of Maryland, and *Thomas M. Wilson III,* Assistant Attorney General, argued the cause for respondents in all cases. With them on the brief were *John F. Oster,* Deputy Attorney General, and *John A. Woodstock* and *Steven P. Resnick,* Assistant Attorneys General.†

MR. JUSTICE STEVENS delivered the opinion of the Court.

A Maryland statute provides that a producer or refiner of petroleum products (1) may not operate any retail service station within the State, and (2) must extend all "voluntary

---

†Briefs of *amici curiae* urging reversal were filed by *Eugene Gressman* for Charter Oil Co. et al.; and by *John S. McDaniel, Jr.,* and *William J. Rubin* for Crown Petroleum Corp.

*Jerry S. Cohen* filed a brief for the National Congress of Petroleum Retailers as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Evelle J. Younger,* Attorney General, *Sanford N. Gruskin,* Chief Assistant Attorney General, *Warren J. Abbott,* Assistant Attorney General, and *Michael I. Spiegel* and *Linda L. Tedeschi,* Deputy Attorneys General, for the State of California; by *Erwin N. Griswold* for Champlin Petroleum Co. et al.; and by *George W. Liebmann, Robert B. Levin,* and *Robert G. Levy* for Day Enterprises, Inc., et al.

allowances" uniformly to all service stations it supplies.[1] The questions presented are whether the statute violates either the Commerce or the Due Process Clause of the Constitution of the United States, or is directly or indirectly pre-empted by the congressional expression of policy favoring vigorous competition found in § 2 (b) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526.[2] The Court of Appeals of Maryland answered these questions in

---

[1] The pertinent provisions of the statute are as follows:

"(b) After July 1, 1974, no producer or refiner of petroleum products shall open a major brand, secondary brand or unbranded retail service station in the State of Maryland, and operate it with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm, or corporation, managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.

"(c) After July 1, 1975, no producer or refiner of petroleum products shall operate a major brand, secondary brand, or unbranded retail service station in the State of Maryland, with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm, or corporation managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.

"(d) Every producer, refiner, or wholesaler of petroleum products supplying gasoline and special fuels to retail service station dealers shall extend all voluntary allowances uniformly to all retail service station dealers supplied." Md. Code Ann., Art. 56, § 157E (Supp. 1977).

[2] "Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." 15 U. S. C. § 13 (b) (1976 ed.).

favor of the validity of the statute. 279 Md. 410, 370 A. 2d 1102 and 372 A. 2d 237 (1977). We affirm.

## I

The Maryland statute is an outgrowth of the 1973 shortage of petroleum. In response to complaints about inequitable distribution of gasoline among retail stations, the Governor of Maryland directed the State Comptroller to conduct a market survey. The results of that survey indicated that gasoline stations operated by producers or refiners had received preferential treatment during the period of short supply. The Comptroller therefore proposed legislation which, according to the Court of Appeals, was "designed to correct the inequities in the distribution and pricing of gasoline reflected by the survey." *Id.*, at 421, 370 A. 2d, at 1109. After legislative hearings and a "special veto hearing" before the Governor, the bill was enacted and signed into law.

Shortly before the effective date of the Act, Exxon Corp. filed a declaratory judgment action challenging the statute in the Circuit Court of Anne Arundel County, Md. The essential facts alleged in the complaint are not in dispute. All of the gasoline sold by Exxon in Maryland is transported into the State from refineries located elsewhere. Although Exxon sells the bulk of this gas to wholesalers and independent retailers, it also sells directly to the consuming public through 36 company-operated stations.[3] Exxon uses these stations to test innovative marketing concepts or products.[4] Focusing primarily on the Act's requirement that it discontinue its operation of these 36 retail stations, Exxon's complaint challenged the

---

[3] As used by the Court of Appeals and in this opinion, "company-operated station" refers to a retail service station operated directly by employees of a refiner or producer of petroleum products (or a subsidiary). 279 Md., at 419 n. 2, 370 A. 2d, at 1108 n. 2.

[4] For instance, Exxon has used its company-operated stations to introduce such marketing ideas as partial self-service, in-bay car-wash units, and motor-oil vending machines. App. 205–209.

validity of the statute on both constitutional and federal statutory grounds.[5]

During the ensuing nine months, six other oil companies instituted comparable actions. Three of these plaintiffs, or their subsidiaries, sell their gasoline in Maryland exclusively through company-operated stations.[6] These refiners, using trade names such as "Red Head" and "Scot," concentrate largely on high-volume sales with prices consistently lower than those offered by independent dealer-operated major brand stations. Testimony presented by these refiners indicated that company ownership is essential to their method of private brand, low-priced competition. They therefore joined Exxon in its attack on the divestiture provisions of the Maryland statute.

The three other plaintiffs, like Exxon, sell major brands primarily through dealer-operated stations, although they also operate at least one retail station each.[7] They, too, challenged the statute's divestiture provisions, but, in addition, they specially challenged the requirement that "voluntary allowances" be extended uniformly to all retail service stations supplied in the State. Although not defined in the statute, the term "voluntary allowances" refers to temporary price reductions granted by the oil companies to independent dealers who

---

[5] Exxon presented nine arguments, both constitutional and statutory. It contended that the statute was arbitrary and irrational under the Due Process Clause; constituted an unconstitutional taking of property without just compensation; denied it, in two distinct ways, the equal protection of the laws; constituted an unlawful delegation of legislative authority; was unconstitutionally vague; discriminated against and burdened interstate commerce; and was pre-empted by the Robinson-Patman Act and the Federal Emergency Petroleum Allocation Act of 1973. *Id.,* at 14–16.

[6] These plaintiffs are Continental Oil Co. (and its subsidiary Kayo Oil Co.), Commonwealth Oil Refining Co. (and its subsidiary Petroleum Marketing Corp.), and Ashland Oil Co.

[7] These plaintiffs are Phillips Petroleum Co., Shell Oil Co., and Gulf Oil Corp.

are injured by local competitive price reductions of competing retailers.[8]   The oil companies regard these temporary allowances as legitimate price reductions protected by § 2 (b).   In advance of trial, Exxon, Shell, and Gulf moved for a partial summary judgment declaring this portion of the Act invalid as in conflict with § 2 (b).

The Circuit Court granted the motion, and the trial then focused on the validity of the divestiture provisions.   As brought out during the trial, the salient characteristics of the Maryland retail gasoline market are as follows: Approximately 3,800 retail service stations in Maryland sell over 20 different brands of gasoline.   However, no petroleum products are produced or refined in Maryland, and the number of stations actually operated by a refiner or an affiliate is relatively small, representing about 5% of the total number of Maryland retailers.

The refiners introduced evidence indicating that their ownership of retail service stations has produced significant benefits for the consuming public.[9]   Moreover, the three refiners that now market solely through company-operated stations may elect to withdraw from the Maryland market altogether if the statute is enforced.   There was, however, no evidence that the total quantity of petroleum products shipped into Maryland would be affected by the statute.[10]   After trial, the Circuit Court held the entire statute invalid, primarily on substantive due process grounds.

The Maryland Court of Appeals reversed, rejecting all of the refiners' attacks against both the divestiture provisions and

---

[8] See 279 Md., at 445–446, 370 A. 2d, at 1121–1122.

[9] *Id.*, at 418–420, 370 A. 2d, at 1107–1108.

[10] The Court of Appeals stated that the statute "would not in any way restrict the free flow of petroleum products into or out of the state." *Id.*, at 431, 370 A. 2d, at 1114.   While the evidence in the record does not directly support this assertion, it is certainly a permissible inference to be drawn from the evidence, or lack thereof, presented by the appellants. See Reply Brief for Appellants in No. 77–64, p. 7.

the voluntary-allowance provision. Most of those attacks are not pursued here; [11] instead, appellants have focused their appeals on the claims that the Maryland statute violates the Due Process and Commerce Clauses and that it is in conflict with the Robinson-Patman Act.

## II

Appellants' substantive due process argument requires little discussion.[12] The evidence presented by the refiners may cast some doubt on the wisdom of the statute, but it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary "to sit as a 'superlegislature to weigh the wisdom of legislation' . . . ." *Ferguson* v. *Skrupa*, 372 U. S. 726, 731 (citation omitted). Responding to evidence that producers and refiners were favoring company-operated stations in the allocation of gasoline and that this would eventually decrease the competitiveness of the retail market, the State enacted a law prohibiting producers and refiners from operating their own stations. Appellants argue that this response is irrational and that it will frustrate rather than further the State's desired goal of enhancing competition. But, as the Court of Appeals observed, this argument rests simply on an evaluation of the economic wisdom of the statute, 279 Md., at 428, 370 A. 2d, at 1112, and cannot override the State's authority "to legislate against what are found to be injurious practices in their internal commercial and business affairs . . . ." *Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.*, 335 U. S. 525, 536.[13] Regardless of the ultimate economic

[11] See n. 5, *supra*.

[12] Indeed, although the Circuit Court's decision rested primarily on the substantive due process claim, only appellants Continental Oil and its subsidiary, Kayo Oil, press that claim here.

[13] It is worth noting that divestiture is by no means a novel method of economic regulation, and is found in both federal and state statutes. To date, the courts have had little difficulty sustaining such statutes against a substantive due process attack. See, *e. g., Paramount Pictures,*

efficacy of the statute, we have no hesitancy in concluding that it bears a reasonable relation to the State's legitimate purpose in controlling the gasoline retail market, and we therefore reject appellants' due process claim.

## III

Appellants argue that the divestiture provisions of the Maryland statute violate the Commerce Clause in three ways: (1) by discriminating against interstate commerce; (2) by unduly burdening interstate commerce; and (3) by imposing controls on a commercial activity of such an essentially interstate character that it is not amenable to state regulation.

Plainly, the Maryland statute does not discriminate against interstate goods, nor does it favor local producers and refiners. Since Maryland's entire gasoline supply flows in interstate commerce and since there are no local producers or refiners, such claims of disparate treatment between interstate and local commerce would be meritless. Appellants, however, focus on the retail market, arguing that the effect of the statute is to protect in-state independent dealers from out-of-state competition. They contend that the divestiture provisions "create a protected enclave for Maryland independent dealers . . . ."[14] As support for this proposition, they rely on the fact that the burden of the divestiture requirements falls solely on interstate companies. But this fact does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level.

As the record shows, there are several major interstate marketers of petroleum that own and operate their own retail

---

*Inc.* v. *Langer,* 23 F. Supp. 890 (ND 1938), dismissed as moot, 306 U. S. 619; see generally Comment, Gasoline Marketing Practices and "Meeting Competition" under the Robinson-Patman Act, 37 Md. L. Rev. 323, 329 n. 44 (1977).

[14] Brief for Appellants in No. 77–10, p. 27.

gasoline stations.[15] These interstate dealers, who compete directly with the Maryland independent dealers, are not affected by the Act because they do not refine or produce gasoline. In fact, the Act creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market. The absence of any of these factors fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce. See, e. g., Hunt v. Washington Apple Advertising Comm'n, 432 U. S. 333; Dean Milk Co. v. Madison, 340 U. S. 349. For instance, the Court in Hunt noted that the challenged state statute raised the cost of doing business for out-of-state dealers, and, in various other ways, favored the in-state dealer in the local market. 432 U. S., at 351–352. No comparable claim can be made here. While the refiners will no longer enjoy their same status in the Maryland market, in-state independent dealers will have no competitive advantage over out-of-state dealers. The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce.[16]

---

[15] For instance, as of July 1, 1974, such interstate, nonrefining or non-producing, companies as Sears, Roebuck & Co., Hudson Oil Co., and Pantry Pride operated retail gas stations in Maryland. App. 190–191. Hudson has, however, recently acquired a refinery. See Brief for Appellants in No. 77–10, p. 33 n. 17.

[16] If the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market—as in Hunt, 432 U. S., at 347, and Dean Milk, 340 U. S., at 354—the regulation may have a discriminatory effect on interstate commerce. But the Maryland statute has no impact on the relative proportions of local and out-of-state goods sold in Maryland and, indeed, no demonstrable effect whatsoever on the interstate flow of goods. The sales by independent retailers are just as much a part of

Appellants argue, however, that this fact does show that the Maryland statute impermissibly *burdens* interstate commerce. They point to evidence in the record which indicates that, because of the divestiture requirements, at least three refiners will stop selling in Maryland, and which also supports their claim that the elimination of company-operated stations will deprive the consumer of certain special services. Even if we assume the truth of both assertions, neither warrants a finding that the statute impermissibly burdens interstate commerce.

Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners. The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.

The crux of appellants' claim is that, regardless of whether the State has interfered with the movement of goods in interstate commerce, it has interfered "with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794, 806. Appellants then claim that the statute "will surely change the market structure by weakening the independent refiners . . . ."[17] We cannot, however, accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market. See *Breard* v. *Alexandria,* 341 U. S. 622. As indicated by the Court in *Hughes,* the Clause protects the interstate market, not particular interstate firms, from prohib-

---

the flow of interstate commerce as the sales made by the refiner-operated stations.

[17] Reply Brief for Appellants in No. 77–64, p. 7.

itive or burdensome regulations. It may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce.

Finally, we cannot adopt appellants' novel suggestion that because the economic market for petroleum products is nation-wide, no State has the power to regulate the retail marketing of gas. Appellants point out that many state legislatures have either enacted or considered proposals similar to Maryland's,[18] and that the cumulative effect of this sort of legislation may have serious implications for their national marketing operations. While this concern is a significant one, we do not find that the Commerce Clause, by its own force, pre-empts the field of retail gas marketing. To be sure, "the Commerce Clause acts as a limitation upon state power even without congressional implementation." *Hunt* v. *Washington Apple Advertising Comm'n, supra,* at 350. But this Court has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods. See *Wabash, St. L. & P. R. Co.* v. *Illinois,* 118 U. S. 557; see also *Cooley* v. *Board of Wardens,* 12 How. 299, 319. The evil that appellants perceive in this litigation is not that the several States will enact differing regulations, but rather that they will all conclude that divestiture provisions are warranted. The problem thus is not one of national uniformity. In the absence of a relevant congressional declaration of policy, or a showing of a specific discrimination against, or burdening

---

[18] California, Delaware, the District of Columbia, and Florida have adopted laws restricting refiners' operation of service stations. Similar proposals have been before the legislatures of 32 other jurisdictions. See Brief for Appellants in No. 77–10, p. 45 nn. 21 and 22; Brief for the State of California as *Amicus Curiae.*

of, interstate commerce, we cannot conclude that the States are without power to regulate in this area.

## IV

Exxon, Phillips, Shell, and Gulf contend that the requirement that voluntary allowances be extended to all retail service stations is either in direct conflict with § 2 (b) of the Clayton Act, as amended by the Robinson-Patman Act, or, more generally, in conflict with the basic federal policy in favor of competition, which is reflected in the Sherman Act as well as § 2 (b). In rejecting these contentions, the Maryland Court of Appeals noted that the Maryland statute covered two different competitive situations.[19] In the first situation a competing retailer lowers its price on its own, and the oil company gives its own retailer a price reduction to enable it to meet that lower price. In the second situation, the competing retailer's lower price is subsidized by its supplier, and the oil company gives its own retailer a price reduction to meet the competition. The good-faith defense of § 2 (b) is clearly not available to the oil company in the first situation because the voluntary allowance would not be a response to competition from another oil company. See *FTC* v. *Sun Oil Co.*, 371 U .S. 505. In the second situation the law is unsettled,[20] but the

---

[19] The Court of Appeals also noted that there is a third competitive situation—a discriminatory price reduction made to meet an equally low price offered to the *same* buyer by a competing seller. In the lower court's view, this situation clearly fell within the § 2 (b) defense, but was not encompassed by the term "voluntary allowances." 279 Md., at 452, 370 A. 2d, at 1125.

[20] The Court left the question open in *Sun Oil*, 371 U. S., at 512 n. 7, and the lower courts have reached conflicting results. Compare *Enterprise Industries* v. *Texas Co.*, 136 F. Supp. 420 (Conn. 1955), rev'd on other grounds, 240 F. 2d 457 (CA2 1957), cert. denied, 353 U. S. 965, with *Bargain Car Wash, Inc.* v. *Standard Oil Co. (Indiana)*, 466 F. 2d 1163 (CA7 1972).

Court of Appeals concluded that the defense would also be unavailable. The court therefore reasoned that there was no conflict between the Maryland statute and § 2 (b), since the statute did not apply to any allowance protected by federal law. In our opinion, it is not necessary to decide whether the § 2 (b) defense would apply in the second situation, for even assuming that it does, there is no conflict between the Maryland statute and the Robinson-Patman Act sufficient to require pre-emption.

Appellants' first argument is that compliance with the Maryland statute may cause them to violate the Robinson-Patman Act. They stress the possibility that the requirement that a price reduction be made on a statewide basis may result in discrimination between customers who would otherwise receive the same price, and they describe various hypothetical situations to illustrate this point.[21] But, "[i]n this as in other areas of coincident federal and state regulation, the 'teaching of this Court's decisions . . . enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists.' *Huron Cement Co.* v. *Detroit*, 362 U. S. 440, 446." *Seagram & Sons, Inc.* v. *Hostetter*, 384 U. S. 35, 45. See also *State* v. *Texaco, Inc.*, 14 Wis. 2d 625, 111 N. W. 2d 918 (1961). The Court in *Seagram & Sons* went on to say that "[a]lthough it is possible to envision circumstances under which price dis-

---

[21] Appellants argue that compliance with the "voluntary allowance" provision may expose them to both primary-line and secondary-line liability under § 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act. With respect to primary-line liability, they pose the hypothesis of a seller who responds to a competitor's lower price in Baltimore. Under the statute, he must lower his prices throughout the State, even though the competitive market justifying that price is confined to Baltimore. Appellants then argue that a competitor operating only in Salisbury, Md., may be injured by this price reduction. But an injury flowing from a uniform price reduction is not actionable under the Robinson-Patman Act, which only prohibits price discrimination. See F. Rowe, Price Discrimination Under the Robinson-Patman Act 93 (1962).

criminations proscribed by the Robinson-Patman Act might be compelled by [the state statute], the existence of such potential conflicts is entirely too speculative in the present posture of this case" to warrant pre-emption. 384 U. S., at 46. That counsel of restraint applies with even greater force here. For even if we were to delve into the hypothetical situations posed by appellants, we would not be presented with a state statute that requires a violation of the Robinson-Patman Act. Instead, the alleged "conflict" here is in the possibility that the Maryland statute may require uniformity in some situations in which the Robinson-Patman Act would *permit* localized discrimination.[22]   This sort of hypothetical conflict is not sufficient to warrant pre-emption.

Appellants, however, also claim that the Robinson-Patman Act does not simply permit localized discrimination, but actually establishes a federal right to engage in discriminatory pricing in certain situations.   They argue that this federal right may be found directly in § 2 (b), or, more generally, in our Nation's basic policy favoring competition as reflected in the Sherman Act as well as § 2 (b).   We find neither argument persuasive.

The proviso in § 2 (b) of the Clayton Act, as amended by

---

[22] Thus, appellants' claim that the statute will create secondary-line liability is premised on the possibility that price differentials may arise between stations located in Maryland and those in neighboring States. With respect to this claim, it is sufficient to note that, although the Maryland statute may affect the business decision of whether or not to reduce prices, it does not create any irreconcilable conflict with the Robinson-Patman Act.   The statute may require that a voluntary allowance that could legally have been confined to the Baltimore area be extended to Salisbury.   We may then assume, *arguendo,* that the Robinson-Patman Act could require a further extension of the allowance into the neighboring State.   The possible scope of the voluntary allowance may, therefore, have an impact on the company's decision on whether or not to meet the competition in Baltimore, but the state statute does not in any way require discriminatory prices.   See also n. 20, *supra.*

the Robinson-Patman Act, is merely an exception to that statute's broad prohibition against discriminatory pricing. It created no new federal right; quite the contrary, it defined a specific, limited defense, and even narrowed the good-faith defense that had previously existed.[23] To be sure, the defense is an important one, and the interpretation of its contours has been informed by the underlying national policy favoring competition which it reflects.[24] But it is illogical to infer that by excluding certain competitive behavior from the general ban against discriminatory pricing, Congress intended to preempt the States' power to prohibit any conduct within that exclusion. This Court is generally reluctant to infer preemption, see, e. g., *De Canas* v. *Bica,* 424 U. S. 351, 357–358, n. 5; *Merrill Lynch, Pierce, Fenner & Smith* v. *Ware,* 414 U. S. 117, 127, and it would be particularly inappropriate to do so in this case because the basic purposes of the state statute and the Robinson-Patman Act are similar. Both reflect a policy choice favoring the interest in equal treatment of all customers

[23] Section 2 of the original Clayton Act, 38 Stat. 730, established an absolute defense for a seller's reductions in price made "in good faith to meet competition . . . ." The legislative history of the Robinson-Patman Act shows that § 2 (b) was intended to limit that broad defense. See *Standard Oil Co.* v. *FTC,* 340 U. S. 231, 247–249, n. 14.

[24] In holding that § 2 (b) created a substantive, rather than merely a procedural, defense, the Court explained:

"The heart of our national economic policy long has been faith in the value of competition. In the Sherman and Clayton Acts, as well as in the Robinson-Patman Act, 'Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent.' *Staley Mfg. Co.* v. *Federal Trade Comm'n,* 135 F. 2d 453, 455. We need not now reconcile, in its entirety, the economic theory which underlies the Robinson-Patman Act with that of the Sherman and Clayton Acts. It is enough to say that Congress did not seek by the Robinson-Patman Act either to abolish competition or so radically to curtail it that a seller would have no substantial right of self-defense against a price raid by a competitor." *Standard Oil Co., supra,* at 248–249 (footnote omitted).

over the interest in allowing sellers freedom to make selective competitive decisions.[25]

Appellants point out that the Robinson-Patman Act itself may be characterized as an exception to, or a qualification of, the more basic national policy favoring free competition,[26] and argue that the Maryland statute "undermin[es]" the competitive balance that Congress struck between the Robinson-Patman and Sherman Acts.[27] This is merely another way of stating that the Maryland statute will have an anticompetitive effect. In this sense, there is a conflict between the statute and the central policy of the Sherman Act—our "charter of economic liberty." *Northern Pacific R. Co. v. United States,* 356 U. S. 1, 4. Nevertheless, this sort of conflict cannot itself constitute a sufficient reason for invalidating the Maryland statute. For if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed.[28] We are, therefore, satisfied that neither the broad implications of the Sherman Act nor the Robinson-Patman Act can fairly

---

[25] Just as the political and economic stimulus for the Robinson-Patman Act was the perceived need to protect independent retail stores from "chain stores," see U. S. Department of Justice, Report on the Robinson-Patman Act 114–124 (1977), so too the Maryland statute was prompted by the perceived need to protect independent retail service station dealers from the vertically integrated oil companies. 279 Md., at 422, 370 A. 2d, at 1109.

[26] Indeed, many have argued that the Robinson-Patman Act is fundamentally anticompetitive and undermines the purposes of the Sherman Act. See generally U. S. Department of Justice Report, *supra.*

[27] Brief for Appellants in No. 77–10, p. 80.

[28] Appellants argue that Maryland has actually regulated beyond its boundaries, pointing to the possibility that they may have to extend voluntary allowances into neighboring States in order to avoid liability under the Robinson-Patman Act. See nn. 21 and 22, *supra.* But this alleged extra-territorial effect arises from the Robinson-Patman Act, not the Maryland statute.

be construed as a congressional decision to pre-empt the power of the Maryland Legislature to enact this law.

The judgment is affirmed.

*So ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.

MR. JUSTICE BLACKMUN, concurring in part and dissenting in part.

Although I agree that the Maryland Motor Fuel Inspection Law [1] does not offend substantive due process or federal anti-

---

[1] The presently challenged portions of the law were enacted four years ago and amended once since then. 1974 Md. Laws, ch. 854; 1975 Md. Laws, ch. 608. The statute is now codified as Md. Code Ann., Art. 56, § 157E (Supp. 1977), and reads:

"(a) For the purpose of this law all gasoline and special fuels sold or offered or exposed for sale shall be subject to inspection and analysis as hereinafter provided. . . .

"(b) After July 1, 1974, no producer or refiner of petroleum products shall open a major brand, secondary brand or unbranded retail service station in the State of Maryland, and operate it with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm, or corporation, managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.

"(c) After July 1, 1975, no producer or refiner of petroleum products shall operate a major brand, secondary brand, or unbranded retail service station in the State of Maryland, with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm, or corporation managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.

"(d) Every producer, refiner, or wholesaler of petroleum products supplying gasoline and special fuels to retail service station dealers shall extend all voluntary allowances uniformly to all retail service station dealers supplied.

"(e) Every producer, refiner, or wholesaler of petroleum products supplying gasoline and special fuels to retail service station dealers shall

trust policy, I dissent from Part III of the Court's opinion because it fails to condemn impermissible discrimination against interstate commerce in *retail* gasoline marketing. The divestiture provisions, Md. Code Ann., Art. 56, §§ 157E (b) and (c) (Supp. 1977) (hereinafter referred to as §§ (b) and (c)), preclude out-of-state competitors from retailing gasoline within Maryland. The effect is to protect in-state retail service station dealers from the competition of the out-of-state businesses. This protectionist discrimination is not justified by any legitimate state interest that cannot be vindicated by more evenhanded regulation. Sections (b) and (c), therefore, violate the Commerce Clause.[2]

# I

In Maryland the retail marketing of gasoline is interstate commerce, for all petroleum products come from outside the State. Retailers serve interstate travelers. To the extent that particular retailers succeed or fail in their businesses, the interstate wholesale market for petroleum products is affected. Cf. *Dean Milk Co.* v. *Madison,* 340 U. S. 349 (1951).[3] The

---

apply all equipment rentals uniformly to all retail service station dealers supplied.

"(f) Every producer, refiner or wholesaler of petroleum products shall apportion uniformly all gasoline and special fuels to all retail service station dealers during periods of shortages on an equitable basis, and shall not discriminate among the dealers in their allotments."

[2] U. S. Const., Art. I, § 8, cl. 3:

"The Congress shall have Power . . .

"To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

[3] The inherent effect of local regulation of retail sales on interstate commerce is well illustrated by *Dean Milk.* The city of Madison forbade the sale of pasteurized milk unless pasteurization occurred at a plant located within five miles of the center of the city. General Ordinances of the City of Madison § 7.21 (1949). Even though only local sale was prohibited, the Court considered the ordinance to be a regulation of interstate commerce.

regulation of retail gasoline sales is therefore within the scope of the Commerce Clause.  See *ibid.; Minnesota* v. *Barber,* 136 U. S. 313 (1890).[4]

## A

The Commerce Clause forbids discrimination against interstate commerce, which repeatedly has been held to mean that States and localities may not discriminate against the transactions of out-of-state actors in interstate markets.  *E. g., Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333, 350–352 (1977); *Halliburton Oil Well Co.* v. *Reily,* 373 U. S. 64, 69–73 (1963); *Dean Milk Co.* v. *Madison,* 340 U. S., at 354; *Best & Co.* v. *Maxwell,* 311 U. S. 454, 455–456 (1940). The discrimination need not appear on the face of the state or local regulation.  "The commerce clause forbids discrimination, whether forthright or ingenious.  In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." *Ibid.* (footnote omitted).  The state or local authority need not intend to discriminate in order to offend the policy of maintaining a free-flowing national economy.  As demonstrated in *Hunt,* a statute that on its face restricts both intrastate and interstate transactions may violate the Clause by having the "practical effect" of discriminating in its operation.  432 U. S., at 350–352.

If discrimination results from a statute, the burden falls upon the state or local government to demonstrate legitimate local benefits justifying the inequality and to show that less discriminatory alternatives cannot protect the local interests.

---

[4] Cf. *Best & Co.* v. *Maxwell,* 311 U. S. 454 (1940) (holding that taxation of local retailing was within the reach of the Commerce Clause); *United States* v. *Frankfort Distilleries, Inc.,* 324 U. S. 293 (1945) (holding that retailing was interstate commerce within the scope of the Sherman Act). See generally Note, Gasoline Marketing Divestiture Statutes: A Preliminary Constitutional and Economic Assessment, 28 Vand. L. Rev. 1277, 1303 (1975).

*Id.,* at 353; *Dean Milk Co.* v. *Madison,* 340 U. S., at 354. This Court does not merely accept without analysis purported local interests. Instead, it independently identifies the character of the interests and judges for itself whether alternatives will be adequate. For example, in *Dean Milk* the city attempted to justify a milk pasteurization ordinance by claiming it to be a necessary health measure. The city's assertion was not conclusive, however:

> "A different view, that the ordinance is valid simply because it professes to be a health measure, would mean that the Commerce Clause of itself imposes no limitations on state action other than those laid down by the Due Process Clause, save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Ibid.*

In an independent assessment of the asserted purpose, the Court determined exactly how the ordinance protected public health and then concluded that other measures could accomplish the same ends. *Id.,* at 354–356. The city's public health purpose therefore did not justify the discrimination, and the ordinance violated the Commerce Clause.

### B

With this background, the unconstitutional discrimination in the Maryland statute becomes apparent. No facial inequality exists; §§ (b) and (c) preclude all refiners and producers from marketing gasoline at the retail level. But given the structure of the retail gasoline market in Maryland, the effect of §§ (b) and (c) is to exclude a class of predominantly out-of-state gasoline retailers while providing protection from competition to a class of nonintegrated retailers that is overwhelmingly composed of local businessmen. In 1974, of the 3,780 gasoline service stations in the State, 3,547 were operated by nonintegrated local retail dealers. App. 191, 569, 755. Of the 233 company-operated stations, 197 belonged to out-of-

state integrated producers or refiners. *Id.*, at 190–191. Thirty-four were operated by nonintegrated companies that would not have been affected immediately by the Maryland statute.[5] *Ibid.* The only in-state integrated petroleum firm, Crown Central Petroleum, Inc., operated just two service stations. *Id.*, at 189. Of the class of stations statutorily insulated from the competition of the out-of-state integrated firms, then, more than 99% were operated by local business interests. Of the class of enterprises excluded entirely from participation in the retail gasoline market, 95% were out-of-state firms, operating 98% of the stations in the class. *Ibid.*

The discrimination suffered by the out-of-state integrated producers and refiners is significant. Five of the excluded enterprises, Ashland Oil, Inc., BP Oil, Inc., Kayo Oil Co., Petroleum Marketing Corp., and Southern States Cooperative, Inc., market nonbranded gasoline through price competition rather than through brand recognition. Of the 98 stations marketing gasoline in this manner, all but 6 are company operated. The company operations result from the dominant fact of price competition marketing. According to repeated testimony from petroleum economics experts and officers of price marketers—testimony that the trial court did not discredit—such nonbranded stations can compete successfully only if they have day-to-day control of the retail price of their products, the hours of operation of their stations, and related business details. App. 320, 357, 370–371, 449–451, 503–504,

---

[5] In 1974 Fisca Oil Co., Giant Food, Inc., Hi-Way Oil, Inc., Homes Oil Co., Hudson Oil Co., Midway Petroleum, National Oil Co., Pantry Pride, Savon Gas Stations, and Sears, Roebuck & Co. operated gasoline stations in Maryland. Because none of these organizations produced or refined petroleum at that time, the statute would not have restricted their operations. It should be noted, however, that the statute will reach any of these firms deciding to integrate backwards from retailing to refining or producing. After this suit was filed, Hudson Oil Co. acquired a refinery and thus became another out-of-state business subject to the ban of §§ (b) and (c). App. 518–519.

517, 529–530; Joint App. to Jurisdictional Statements 102a *et seq.* Only with such control can sufficient sales volume be achieved to produce satisfactory profits at prices two to three cents a gallon below those of the major branded stations. Dealer operation of stations precludes such control because of the illegality of vertical price fixing. See, *e. g.,* 15 U. S. C. § 1 (1976 ed.); *White Motor Co.* v. *United States,* 372 U. S. 253 (1963). Therefore, because §§ (b) and (c) forbid company operations, these out-of-state competitors will have to abandon the Maryland retail market altogether. App. 100, 357–358, 455, 519; Joint App. to Jurisdictional Statements 103a *et seq.*[6] For the same reason 32 other out-of-state national nonbranded integrated marketers, who operate their own stations without dealers, will be precluded from entering the Maryland retail gasoline market.

The record also contains testimony that the discrimination will burden the operations of major branded companies, such as appellants Exxon, Phillips, Shell, and Gulf, all of which are out-of-state firms. Most importantly, §§ (b) and (c) will preclude these companies, as well as those mentioned in the previous paragraph, from competing directly for the profits of retail marketing. According to Richard T. Harvin, retail sales manager for Exxon's eastern marketing region, Exxon's company-operated stations in Maryland annually return 15% of the company's investment—a profit of $700,000 in 1974. App. 316. Sections (b) and (c) will force this return to be shared with the local dealers. In addition, the ban of the sections will preclude the majors from enhancing brand recognition and consumer acceptance through retail outlets with company-controlled standards. *Id.,* at 316, 320, 647, 668–669. Their ability directly to monitor consumer preferences and

---

[6] The sections will force Ashland to divest 17 stations in which it has invested $2,381,385. *Id.,* at 257, 258–259. Petroleum Marketing has 21 stations valued at $2,043,710. *Id.,* at 656.

reactions will be diminished. *Id.*, at 315, 649, 669. And their opportunity for experimentation with retail marketing techniques will be curtailed. *Id.*, at 316–317, 647–649, 669. In short, the divestiture provisions, which will require the appellant majors to cease operation of property valued at more than $10 million, will inflict significant economic hardship on Maryland's major brand companies, all of which are out-of-state firms.

Similar hardship is not imposed upon the local service station dealers by the divestiture provisions. Indeed, rather than restricting their ability to compete, the Maryland Act effectively and perhaps intentionally improves their competitive position by insulating them from competition by out-of-state integrated producers and refiners. In its answers to the various complaints in this case, the State repeatedly conceded that the Act was intended to protect "the retail dealer as an independent businessman [by] reducing the control and dominance of the vertically integrated petroleum producer and refiner in the retail market." *Id.*, at 33; see *id.*, at 51, 54, 104, 128, 132, 145, 147. At trial the State's expert said that the legislation would have the effect of protecting the local dealers against the out-of-state competition. *Id.*, at 613. In short, the foundation of the discrimination in this case is that the local dealers may continue to enter retail transactions and to compete for retail profits while the statute will deny similar opportunities to the class composed almost entirely of out-of-state businesses.[7]

---

[7] Another indication of the discrimination against out-of-state business was the amendment of the original legislative proposal to exempt wholesalers of gasoline from the divestiture requirements. The author of the proposal intended to ban retailing by wholesalers and "not to discriminate against one class as to another." *Id.*, at 568. On cross-examination he was asked why the exemption was enacted. He replied:

"It was up to the General Assembly to make that decision. Apparently the wholesalers were represented at the testimony in the hearings. . . . I did hear at a later date that they wanted to be exempt from it because

With discrimination proved against interstate commerce, the burden falls upon the State to justify the distinction with legitimate state interests that cannot be vindicated with more evenhanded regulation. On the record before the Court, the State fails to carry its burden. It asserts only in general terms a desire to maintain competition in gasoline retailing. Although this is a laudable goal, it cannot be accepted without further analysis, just as the Court could not accept the mere assertion of a public health justification in *Dean Milk*. Here, the State ignores the second half of its responsibility; it does not even attempt to demonstrate why competition cannot be preserved without banning the out-of-state interests from the retail market.

The State's showing may be so meager because any legitimate interest in competition can be vindicated with more evenhanded regulation. First, to the extent that the State's interest in competition is nothing more than a desire to protect particular competitors—less efficient local businessmen—from the legal competition of more efficient out-of-state firms, the interest is illegitimate under the Commerce Clause. A national economy would hardly flourish if each State could effectively insist that local nonintegrated dealers handle product retailing to the exclusion of out-of-state integrated firms that would not have sufficient local political clout to challenge the influence of local businessmen with their local government leaders.[8] Each State would be encouraged to "legislate accord-

---

some of the wholesalers being local jobbers had no investment or financial activity or engagement with the producer-refiner so they wanted to plea upon the mercy of the committee so to speak . . . .

    .        .        .        .        .

"Q. You have no information then as to why the Legislature of Maryland chose to make that discrimination? A. Not other than hearsay as to the general data that these men were local businessmen, had no definite tie in with the refinery . . . ." *Id.*, at 568–569.

[8] There is support in the record for the inference that the Maryland Legislature passed the divestiture provisions in response to the pleas of local

ing to its estimate of its own interests, the importance of its own products, and the local advantages or disadvantages of its position in a political or commercial view." J. Story, Commentaries on the Constitution of the United States § 259 (4th ed. 1873), quoted in *H. P. Hood & Sons* v. *Du Mond,* 336 U. S. 525, 533 (1949). See also, *e. g.,* The Federalist, Nos. 7, 11, 12 (Hamilton), No. 42 (Madison). The Commerce Clause simply does not countenance such parochialism.

Second, a legitimate concern of the State could be to limit the economic power of vertical integration. But nothing in the record suggests that the vertical integration that has

---

gasoline dealers for protection against the competition of both the price marketers and the major oil companies. For example, the executive director of the Greater Washington/Maryland Service Station Association, which represents almost 700 local Maryland dealers, testified before the Economic Matters Committee of the Maryland Senate:

"I would like to begin by telling you gentlemen that these are desperate days for service station dealers. . . .

.         .         .         .         .

"Now beset by the critical gasoline supply situation, the squeeze by his landlord-supplier and the shrinking service and tire, battery and accessory market, the dealer is now faced with an even more serious problem.

"That is the sinister threat of the major oil companies to complete their takeover of the retail-marketing of gasoline, not just to be in competition with their own branded dealers, but to squeeze them out and convert their stations to company operation.

.         .         .         .         .

"Our oil industry has grown beyond the borders of our country to where its American character has been replaced by a multinational one.

"Are the legislators of Maryland now about to let this octopus loose and unrestricted in the state of Maryland, among our small businessmen to devour them? We sincerely hope not.

"The men that you see here today are the back-bone of American small business. . . .

"We are here today asking you, our own legislators to protect us from an economic giant who would take away our very livelihood and our children's future in its greed for greater profits. Please give us the protection we need to save our stations." *Id.,* at 755, 756, 761.

already occurred in the Maryland petroleum market has inhibited competition. Indeed, the trial court found that the retail market, dominated by 3,547 dealer outlets constituting more than 90% of the State's service stations, is highly competitive.[9] Therefore, the State has shown no need for the divestiture of existing company-owned stations required by § (c). The legitimacy of any concern about future integration, which could support the discrimination of § (b), is suspect because of the exemption granted wholesalers, which, not surprisingly, are local businesses able to influence the state legislature.[10] See n. 7, *supra*.

---

[9] From the facts stipulated by the parties, the trial court found:

"Retail petroleum marketing in the State of Maryland is and has been a highly competitive industry. This is a result of the number and location of available facilities, the comparatively small capital costs for entering the business, the mobility of the purchaser at the time of purchasing the products, the relative interchangeability of one competitor's products with another in the mind of the consumer, the visibility of price information, and the many choices the consumer has in terms of prices, brands, and services offered." Joint App. to Jurisdictional Statements 99a.

The continuing competitive nature of the Maryland gasoline market provided one basis for the trial court's holding that the State had not "demonstrated a real and substantial relation to the object sought to be attained by the means selected[;] the evidence presented before it indicates that the statute is inversely related to the public welfare." *Id.*, at 131a–132a. The trial court therefore considered the statute unconstitutional.

[10] The trial court entered several findings about the integration of the oil companies and the need for divestiture:

"Apart from restraining free competition, it was shown that divestiture would be harmful to competition in the industry, and would primarily serve to protect the independent dealers rather than the public at large. There was no proven detrimental effect upon the retail market caused by company-owned-and-operated stations which could not be curbed by federal and state anti-trust laws.

.    .    .    .    .

"The court also finds from the preponderance of the evidence that the law will preclude all of some thirty-two producer-refiners not now in the State from ever entering the competitive market in Maryland, and vertical

Third, the State appears to be concerned about unfair competitive behavior such as predatory pricing or inequitable allocation of petroleum products by the integrated firms. These are the only examples of specific misconduct asserted in the State's answers. App. 33–34, 54–55, 81–83, 109–111, 133–134, 148–149. But none of the concerns support the discrimination in §§ (b) and (c). There is no proof in the record that any significant portion of the class of out-of-state firms burdened by the divestiture sections has engaged in such misconduct. Furthermore, predatory pricing and unfair allocation already have been prohibited by both state and federal law. See, e. g., Emergency Petroleum Allocation Act of 1973, 87 Stat. 628, 15 U. S. C. § 751 et seq. (1976 ed.); Energy Policy and Conservation Act, § 461, 89 Stat. 955, 15 U. S. C. § 760g (1976 ed.); Maryland Motor Fuel Inspection Law, Md. Code Ann., Art. 56, § 157E (f) (Supp. 1977); Maryland Antitrust Act, Md. Com. Law Code Ann. § 11–201 et seq. (1975); Maryland Unfair Sales Act, Md. Com. Law Code Ann. § 11–401 et seq. (1975). Less discriminatory legislation, which would regulate the leasing of all service stations, not just those owned by the out-of-state integrated producers and refiners, could prevent whatever evils arise from short-

integration will be prohibited. Neither effect is in the public interest since competition is essentially for consumer benefit.

"Noteworthy also is the fact that the original draft of the law included wholesalers in the prohibition against retail selling. The final draft of the law eliminated wholesalers, for the sole reason, according to Mr. Coleman, that the wholesalers requested their elimination from the act. There is no evidence whatsoever relative to why wholesalers should have been included initially, nor how the general public benefited from their exemption.

"In all the more than one hundred eighty-five pounds of pleadings, motions, briefs, exhibits and depositions before this court, there is no concrete evidence that the act was justified as to the classes of operators singled out to be affected in order to promote the general welfare of the citizens of the State. *Rather, it is apparent that the entire bill is designed to benefit one class of merchants to the detriment of another.*" *Id.,* at 130a–131a (emphasis supplied).

term leases. Cf. Maryland Gasoline Products Marketing Act, Md. Com. Law Code Ann. § 11–304 (g) (Supp. 1977).[11]

In sum, the State has asserted before this Court only a vague interest in preserving competition in its retail gasoline market. It has not shown why its interest cannot be vindicated by legislation less discriminatory toward out-of-state retailers. It therefore has not met its burden to justify the discrimination inherent in §§ (b) and (c), and they violate the Commerce Clause.

## II

The arguments of the Court's opinion, the Maryland Court of Appeals decision,[12] and appellees do not remove the unconstitutional taint from the discrimination inherent in §§ (b) and (c).

## A

The Court offers essentially three responses to the discrimination in the retail gasoline market imposed by the divestiture provisions.[13] First, the Court says that the discrimination

---

[11] This statute states:

"(g) *Distributor may not unreasonably withhold certain consents* . . . The distributor may not unreasonably withhold his consent to any assignment, transfer, sale, or renewal of a marketing agreement. . . ."

[12] 279 Md. 410, 370 A. 2d 1102 and 372 A. 2d 237 (1977). The trial court, the Circuit Court for Anne Arundel County, Md., did not address the question whether §§ (b) and (c) unconstitutionally discriminated against interstate commerce. It held that the statute offended substantive due process, in violation of the Maryland Declaration of Rights, Art. 23.

[13] The Court also notes that §§ (b) and (c) do not discriminate against interstate goods and do not favor local producers and refiners. While true, the observation is irrelevant because it does not address the discrimination inflicted upon retail marketing in the State. Cf. Part II–B, *infra*.

Footnote 16 of the Court's opinion, *ante*, at 126–127, suggests that unconstitutional discrimination does not exist unless there is an effect on the quantity of out-of-state goods entering a State. This is too narrow a view of the Commerce Clause. First, interstate commerce consists of far more than mere production of goods. It also consists of transactions—of repeated buying and selling of both goods and services. By focusing exclu-

against the class of out-of-state producers and refiners does not violate the Commerce Clause because the State has not imposed similar discrimination against other out-of-state retailers. *Ante,* at 125–126. This is said to distinguish the present case from *Hunt* v. *Washington Apple Advertising Comm'n.* In fact, however, the unconstitutional discrimination in *Hunt* was not against all out-of-state interests. North Carolina had enacted a statute requiring that apples marketed in closed containers within the State bear " 'no grade other than the applicable U. S. grade or standard.' " 432 U. S., at 335. The Commission contended that the provision discriminated against interstate commerce because it prohibited the display of superior Washington State apple grading marks. The Court did not strike down the provision because it discriminated against the marketing techniques of *all* out-of-state growers. The provision imposed no discrimination on growers from States that employed only the United States Department of Agriculture grading system.[14] Despite this

---

sively on the quantity of goods, the Court limits the protection of the Clause to producers and handlers of goods before they enter a discriminating State. In our complex national economy, commercial transactions continue after the goods enter a State. The Court today permits a State to impose protectionist discrimination upon these later transactions to the detriment of out-of-state participants. Second, the Court cites no case in which this Court has held that a burden on the flow of goods is a prerequisite to establishing a case of unconstitutional discrimination against interstate commerce. Neither *Hunt* nor *Dean Milk* contains such a holding. In both of those cases the Court upheld the claims of discrimination; in neither did it say that a burden on the wholesale flow of goods was a necessary part of its holding. Regarding *Hunt,* the Court cites to 432 U. S., at 347, which discusses only whether the appellants had met the $10,000 amount-in-controversy requirement of 28 U. S. C. § 1331. As explained in Part II–B, *infra,* this case presents a threat to the flow of gasoline in Maryland identical to the threat to the flow of milk in *Dean Milk.*

[14] Growers from 13 States marketed apples in North Carolina. Six of the States did not have state grading systems apart from the USDA regulations. 432 U. S., at 349.

lack of universal discrimination, the Court declared the provision unconstitutional because it discriminated against a single segment of out-of-state marketers of apples, namely, the Washington State growers who employed the superior grading system. In this regard, the Maryland divestiture provisions are identical to, not distinguishable from, the North Carolina statute in *Hunt*. Here, the discrimination has been imposed against a segment of the out-of-state retailers of gasoline, namely, those who also refine or produce petroleum.

To accept the argument of the Court, that is, that discrimination must be universal to offend the Commerce Clause, naively will foster protectionist discrimination against interstate commerce. In the future, States will be able to insulate in-state interests from competition by identifying the most potent segments of out-of-state business, banning them, and permitting less effective out-of-state actors to remain. The record shows that the Court permits Maryland to effect just such discrimination in this case. The State bans the most powerful out-of-state firms from retailing gasoline within its boundaries. It then insulates the forced divestiture of 199 service stations from constitutional attack by permitting out-of-state firms such as Pantry Pride, Fisca, Hi-Way, and Midway to continue to operate 34 gasoline stations. Effective out-of-state competition is thereby emasculated—no doubt, an ingenious discrimination. But as stated at the outset, "the commerce clause forbids discrimination, whether forthright or ingenious." *Best & Co.* v. *Maxwell*, 311 U. S., at 455.

Second, the Court contends, as a subpart of its primary argument, that the discrimination in *Hunt* "raised the cost of doing business for out-of-state dealers, and, in various other ways, favored the in-state dealer in the local market. 432 U. S., at 351–352. No comparable claim can be made here." *Ante,* at 126. Once it is seen that the discrimination in *Hunt* raised the cost of doing business for only one group of the out-of-state marketers of apples, the fallacy of the Court's

argument appears. In fact, here the burden imposed upon the class of out-of-state retailers subject to the discrimination of §§ (b) and (c) far exceeds the burdens in *Hunt*. In *Hunt* the statute merely increased costs and deprived the Washington growers of the competitive advantages of the use of their grading system. Here, the statute *bans* the refiners and producers from the retail market altogether—a burden that lacks comparability with the effects in *Hunt* only because it is more severe.

Third, the Court asserts without citation: "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Ante,* at 126. This proposition is correct only to the extent that it is incomplete; it does not apply to the facts present here. It is true that merely demonstrating a burden on some out-of-state actors does not prove unconstitutional discrimination. But when the burden is significant, when it falls on the most numerous and effective group of out-of-state competitors, when a similar burden does not fall on the class of protected in-state businessmen, and when the State cannot justify the resulting disparity by showing that its legislative interests cannot be vindicated by more evenhanded regulation, unconstitutional discrimination exists. The facts of this litigation demonstrate such discrimination, and the Court does not argue persuasively to the contrary.

## B

The contentions of the Maryland Court of Appeals, which also found no violation of the Commerce Clause, are no more convincing than the arguments of the Court's opinion. First, the Court of Appeals reasoned that §§ (b) and (c) did not discriminate against the class of out-of-state refiners and producers because the wholesale flow of petroleum products into the State was not restricted. 279 Md. 410, 431, 370 A. 2d 1102, 1114 (1977). This supposedly distinguished the present

facts from those of *Dean Milk Co. v. Madison,* which involved unconstitutional discrimination against interstate commerce. To begin with, however, the distinction drawn by the Court of Appeals is basically irrelevant. The Maryland statute has not effected discrimination with regard to the wholesaling or interstate transport of petroleum. The discrimination exists with regard to retailing. The fact that gasoline will continue to flow into the State does not permit the State to deny out-of-state firms the opportunity to retail it once it arrives.

Furthermore, *Dean Milk* cannot be distinguished on the ground asserted by the Court of Appeals. There, this Court invalidated § 7.21 of the General Ordinances of the city of Madison (1949), which outlawed the local sale of milk not pasteurized within five miles of the city. The section did not legally or effectively block the flow of out-of-state milk into Madison to any greater extent than the restrictions on sales of gasoline by out-of-state companies block the flow of gasoline here. In *Dean Milk* out-of-state producers could bring their milk to Madison, have it pasteurized in Madison, and sell it in Madison without violating § 7.21. If the flow of milk were at all restricted, it was merely because the out-of-state producers chose not to deal with the Madison pasteurizers. Similarly, the flow of gasoline into Maryland may be restricted if the out-of-state producers and refiners choose not to supply the dealers who replace the company-owned operations.[15]

Second, the Court of Appeals said the Maryland legislation did not offend the Commerce Clause because the legislature intended to preserve competition, not to discriminate against interstate commerce. 279 Md., at 431, 370 A. 2d, at 1114.

---

[15] In fact, the disruption of the flow of gasoline in this case could be greater than the disruption of the flow of milk in Madison. The record supports the proposition that the ban on company operations may so unsettle the wholesale and refining enterprises of the independent price marketers that they will not be able profitably to supply gasoline to the stations of nonintegrated retailers in Maryland. App. 504–505, 509, 531.

With this argument, the court fell into the same trap that confines the State's proffered justifications for the discrimination of §§ (b) and (c). To begin with, the fact that no discrimination was intended is irrelevant where, as here, discriminatory effects result from the statutory scheme. Furthermore, the fact that the legislature might have had a laudable intent when it passed the law cannot by itself justify the divestiture provisions. The State must also show that its interests cannot be vindicated by less discriminatory alternatives. The Court of Appeals erroneously failed to require such a showing from the appellees.

Third, the Court of Appeals resurrected the outdated notion that retailing is merely local activity not subject to the strictures of the Commerce Clause. 279 Md., at 432, 370 A. 2d, at 1114–1115, citing *Crescent Oil Co.* v. *Mississippi,* 257 U. S. 129 (1921). In *Crescent Oil* the Court said that the operation of cotton gins was local manufacturing rather than interstate commerce. As explained at the beginning of Part I of this opinion, however, the interstate character of the retail gasoline market and 57 years of intervening constitutional and economic development prevent the application of *Crescent Oil* to the facts of this litigation. See nn. 3 and 4, and accompanying text, *supra.*

## C

Finally, nothing in the argument of the appellees saves the distinctions in §§ (b) and (c) from the taint of unconstitutionality. First, the State argues that discrimination against interstate commerce has not occurred because "[n]o nexus between interstate as opposed to local interests inheres in the production or refining of petroleum." Brief for Appellees 23. Although this statement might be correct in the abstract, it is incorrect in reality, given the structure of the Maryland petroleum market. Due to geological formation as so far known, no petroleum is produced in Maryland; due to the economics of production and refining, as well as to the geology,

no petroleum is refined in Maryland. As a matter of actual fact, then, an inherent nexus does exist between the out-of-state status of producers and refiners and the distribution and retailing of gasoline in Maryland. The Commerce Clause does not forbid only legislation that discriminates under all factual circumstances. It forbids discrimination in effect against interstate commerce on the specific facts of each case. If production or refining of gasoline occurred in Maryland, §§ (b) and (c) might not be unconstitutional. Under those different circumstances, however, the producers and refiners would have a fair opportunity to influence their local legislators and thereby to prevent the enactment of economically disruptive legislation. Under those circumstances, the economic disruption would be felt directly in Maryland, which would tend to make the local political processes responsive to the problems thereby created. Under those circumstances, §§ (b) and (c) might never have been passed. In this case, however, the economic disruption of the sections is visited upon out-of-state economic interests and not upon in-state businesses. One of the basic assumptions of the Commerce Clause is that local political systems will tend to be unresponsive to problems not felt by local constituents; instead, local political units are expected to act in their constituents' interests.[16] One of the basic purposes of the Clause, therefore, is to prevent the vindication of such self-interest from unfairly burdening out-of-state concerns and thereby disrupting the national economy.

---

[16] Given the Nation's experience under the Articles of Confederation, the assumption is not an unreasonable one. At that time authority to regulate commerce rested with the States rather than with Congress. The pursuit by each State of the particular interests of its economy and constituents nearly wrecked the national economy. "The almost catastrophic results from this sort of situation were harmful commercial wars and reprisals at home among the States . . . ." P. Hartman, State Taxation of Interstate Commerce 2 (1953), citing, e. g., The Federalist, Nos. 7, 11, 22 (Hamilton), No. 42 (Madison).

Second, appellees argue, as did the Court of Appeals, that §§ (b) and (c) do not discriminate impermissibly because the Maryland Legislature passed them with the intent to preserve competition. As explained above, however, the mere assertion of a laudable purpose does not carry the State's burden to justify the discriminatory effects of the statute. See Parts I–B and II–B, *supra*.

Third, appellees rely upon the Court of Appeals' contention that unconstitutional discrimination against interstate commerce can be found only where the flow of interstate goods is curtailed. Appellees' assertion fares no better than did the court's because the appellees fail to show how the effect on the flow of interstate goods varies in kind between this case and *Dean Milk*. See Part II–B, *supra*.

### III

The Court's decision brings to mind the well-known words of Mr. Justice Cardozo:

> "To give entrance to [protectionism] would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 523 (1935).

Today, the Court fails to heed the Justice's admonition. The parochial political philosophy of the Maryland Legislature thereby prevails. I would reverse the judgment of the Maryland Court of Appeals.