**MEDICAL SOCIETY OF the STATE OF NEW YORK, American Medical Association, and Isadore Rosenfeld, M.D., Plaintiffs,**

v.

**Mario M. CUOMO, Governor of the State of New York, and David M. Axelrod, M.D., Commissioner of New York Department of Health, each individually and in their official capacities, Defendants.**

**No. 90 Civ. 8289 (CSH).**

United States District Court,
S.D. New York.

Nov. 12, 1991.

Steven M. Bierman, Sidley & Austin, New York City, Jack R. Bierig, David F. Graham, James C. Dechene, Richard D. Raskin, Sidley & Austin, Chicago, Ill., for plaintiffs; Donald R. Moy, Medical Soc. of State of N.Y., Lake Success, N.Y., Kirk B. Johnson, Edward B. Hirshfeld, Michael L. Ile, American Medical Ass'n, Chicago, Ill., of counsel.

Robert Abrams, Atty. Gen. of State of N.Y., New York City, for defendants; Brian T. McGovern, Asst. Atty. Gen., of counsel.

Rita Shapiro, New York Legal Assistance Group, New York City, Bonnie Ray, New York StateWide Sr. Action Council, Inc., Albany, N.Y., Cheryl A. Houston, New York State Council of Sr. Citizens, Suleika Cabrera Drinane, Institute for Puerto Rican/Hispanic Elderly, Shirley Genn, Brooklyn–Wide Intragency Council of the Aging, Caryn Resnick, JPAC for Older Adults, Carol Wallace, New York State Coalition of the Concerned for Older Americans, New York City, Richard Kirsch, Citizen Action of New York, Albany, N.Y., for amici curiae.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs Medical Society of the State of New York et al. ("Plaintiffs") move for summary judgment pursuant to F.R.C.P. 56. Plaintiffs contend that Chapter 572 of the Laws of New York (codified at N.Y. Public Health Law § 19) is (1) preempted by the Health Insurance for the Aged Act ("Medicare Act;" the "Act"), 42 U.S.C. § 1395 *et seq.* and (2) violative of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Defendants Mario M. Cuomo and David M. Axelrod, M.D., respectively the Governor of New York and at the pertinent times its Commissioner of Health, contest plaintiffs' assertions, and cross-move for summary judgment. For the reasons stated below, this Court finds that Chapter 572 is not preempted by the federal statute, nor does it violate the Fourteenth Amendment.

## BACKGROUND

The federal Medicare program was established in 1965 with the enactment of the Medicare Act. Persons 65 years and older are eligible under the provisions of the Act, as well as certain disabled individuals, regardless of ability to pay. § 1395c.

Part B of the Medicare Act ("Supplementary Medical Insurance Benefits for the Aged and Disabled"), § 1395j–1395w, provides an insurance plan under which medical services for eligible persons are paid by the Federal Supplementary Medical Insurance Trust Fund via a local carrier. In most instances, the program covers 80% of the "reasonable charge" [1] for services ren-

---

1. "Pursuant to section 1395u(b), and the regulations promulgated thereunder, the reasonable charge is equal to the lowest of the following: (1) the actual charge billed by the physician; (2) the "prevailing charge" for similar services in the same locality, 42 C.F.R. § 405.504; and (3) the treating physician's 'customary charge.' *Id.*

dered, with the beneficiary paying the remainder.

Two billing methods were devised for payment of benefits. § 1395u(b)(3)(B). The first method provides for payment "on the basis of an itemized bill." This method, commonly known as "balance billing," is the source of the controversy at bar. Balance billing allows a physician to bill a Medicare beneficiary an amount in excess of the reasonable charge, with the local carrier reimbursing the beneficiary for 80% of the reasonable charge. The second method, "assignment," restricts a physician's fee to the reasonable charge, with the physician being reimbursed by the local carrier for 80% of the fee and the remaining 20% being paid by the beneficiary.

Under both payment plans, Medicare pays for 80% of the reasonable charge. The difference lies in the actual fee. Balance billing "provides a 'safety valve' for physicians who believe that the fee schedule does not adequately reflect the quality of services they provide." Physician Payment Review Commission ("PPRC"), *1989 Annual Report to Congress* at 137. Supporters of balance billing argue that it gives beneficiaries access to quality medical services. Although the total cost of medical services is higher than the reasonable charge level, they say that Medicare pays a large enough portion of the physician's fee to justify the excess cost.

Not surprisingly, opponents of balance billing assert that "extra bills become out-of-pocket liabilities." PPRC, *1988 Annual Report to Congress* at 130. They also note that many beneficiaries are unaware of their insurance options and so may not learn that their physicians balance bill until after the medical services are performed. The beneficiaries only learn of their personal liability after the fact—when it is too late to make other arrangements.

Recognizing the growing concern over balance billing, Congress, in the mid to late 1980's, adopted several plans to remedy the situation. In 1984, Congress initiated the "Participating Physician's Program." This program required physicians to either accept assignment for all billings in the coming year (a "participating physician"), or decide whether to balance bill on a case-by-case basis (a "non-participating physician"). To encourage physicians to participate and agree to assignment of all claims, several incentives were created: (1) participating physicians were listed in a special directory distributed to beneficiaries; (2) a higher reasonable charge was allowed for participating physicians, § 1395u(b)(4)(A)(iv); and (3) a freeze was placed on the amount physicians could balance bill § 1395u(j)(1).

In 1986, the freeze was lifted and replaced with a "maximum allowable actual charge" ("MAAC"), which capped the yearly increase allowed for physicians who balance bill. § 1395u(j)(1). In addition, the PPRC was established to "make recommendations to Congress ... regarding adjustments to the reasonable charge levels for physicians' services ... and changes in the methodology for determining the rates of payments, and for making payment, for physicians' services ..." § 1395w-1(b)(1).

Finally, in 1989, balance billing was capped at a "limiting charge." Under the new provisions, a cap of 25% (or in some instances 40%) above the "recognized payment amount"[2] was imposed for 1991. The cap was lowered to 20% for 1992 and 15% beginning in 1993. § 1395w-4(g)(2).

In 1990, New York passed Chapter 572. Under that Chapter, the limiting charge for physicians who balance bill federal Medicare beneficiaries was capped at 15% above the federal reasonable charge for 1991. In 1993 the cap will be reduced to 10%, and 5% if claims billed at or below the reasonable charge do not increase in 1992 by 5% from their 1989 level. Physicians who violate this provision are subject to fines following a hearing. First-time violators may be

§ 405.503(a)." *Cosgrove v. Bowen,* 898 F.2d 332, 333 (2d Cir.1990).

**2.** § 1395w-4(g)(2)(D) defines "recognized payment amount" for services rendered in 1991 as "the prevailing charge (or fee schedule amount)

for nonparticipating physicians for that year." For services rendered after 1991 it is "the fee schedule amount determined under subsection (a) of this section". *Id.*

fined a maximum of $1,000, while subsequent violations within five years trigger a maximum fine of $5,000. In addition, the physician must refund to the beneficiary the excess money collected. Chapter 572, unlike the federal statute, has no requirement of willfulness or knowledge on the part of the violator. *Compare with* 42 U.S.C. § 1395w–4(g)(1).

At the same time that Congress was considering changes in the balance billing program, various states considered, and in several cases adopted, their own restrictions on balance billing. Massachusetts prohibited the practice altogether in 1985. Physicians who failed to comply with the new state law could not obtain or renew their Massachusetts medical license. 243 C.M.R. 2.07(15); Mass.G.L. c. 112, § 2. In addition, disciplinary action could be taken against violators. 243 C.M.R. 103(8), 1.05(5); Mass.G.L. c. 112, § 5 (1986 Supp.). The legislation prompted a legal challenge, but in *Massachusetts Medical Society v. Dukakis,* 815 F.2d 790 (1st Cir.1987), *cert. denied* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987), the First Circuit upheld the state statute, ruling that it was not preempted by the Medicare Act.

In the years that followed, Congress enacted the amendments discussed above. After passage of the 1989 Amendments, Pennsylvania enacted its own law prohibiting balance billing. In *Pennsylvania Medical Society v. Marconis,* 755 F.Supp. 1305 (W.D.Pa.1991), the district court upheld the state statute against a challenge, on preemption grounds, by the Pennsylvania Medical Society. The Third Circuit affirmed. 942 F.2d 842 (3d. Cir.1991).

## DISCUSSION

### I. Preemption

The Supremacy Clause of the United States Constitution, Article IV, Cl. 2, lies at the heart of this case. It provides:

This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The case at bar involves a law—the Medicare Act—that has been promulgated by the United States Congress. As its constitutionality has not been challenged, it is presumptively made "in pursuance" of the Constitution and is thus the "Supreme Law of the Land." What remains to be decided is whether Congress meant to permit the states to promulgate legislation in the same general area.

The initial inquiry is whether Chapter 572 addresses an area traditionally occupied by the states. This is an important preliminary determination because when Congress legislates in a field historically within the police power of the states, the party arguing preemption carries the heavy burden of showing that preemption was the "clear and manifest purpose of Congress." *Pacific Gas & Electric v. State Energy Resources Comm'n,* 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1989) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)); *see also General Motors Corp. v. Abrams,* 897 F.2d 34, 41–42 (2d Cir.1990) ("compelling evidence" of an intention to preempt must be shown where the area is traditionally regulated by the states). This arises from the related assumption that Congress does not normally intend to displace state law. *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). *See also* Laurence H. Tribe, *American Constitutional Law* § 6–25, at 479–80 (2d ed. 1988) ("The question whether federal law preempts state action, cannot be reduced to general formulas, but there does appear to be an overriding reluctance to infer preemption in ambiguous cases. Such reluctance seems particularly appropriate in light of the Supreme Court's repeated emphasis on the central role of Congress in protecting the sovereignty of the states.").

Chapter 572 clearly involves a matter traditionally within the police powers of

the state: the regulation of public health and the cost of medical care. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985) ("the regulation of health and safety matters is primarily, and historically, a matter of local concern."); *Great Atlantic and Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976); *Rebaldo v. Cuomo,* 749 F.2d 133, 138 (2d Cir. 1984), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985); *Pennsylvania Medical Society v. Marconis,* 942 F.2d 842, 847 (3d Cir.1991) ("The licensing and regulation of physicians is a state function."). The balance billing regulations are designed to provide the elderly and disabled with a high level of health care at an affordable price. Despite the plaintiffs' arguments to the contrary, I see no reason to distinguish between the present case and the blood plasma regulation statutes at issue in *Hillsborough.*[3]

Accordingly Chapter 572 is presumptively valid. Plaintiffs must show that Congress had the "clear and manifest purpose" to displace it. The task at hand is to determine whether such a purpose existed.

■ The Supreme Court has observed that there are three ways in which Congress manifests an intent to preempt state law. *See, e.g., Schneidewind v. ANR Pipeline,* 485 U.S. 293, 300, 108 S.Ct. 1145, 1151, 99 L.Ed.2d 316 (1988); *California Fed. Savings & Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). The first, "express preemption," occurs when Congress declares its intention to preempt state law by so stating. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). No such express provision appears here. The second, "implied preemption," occurs where Congress has impliedly precluded state regulation by "occupying the field" through the structure or objectives of federal law. Intent to supersede state law altogether may be found where the scheme of federal regulation "is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Guerra,* 479 U.S. at 280–81, 107 S.Ct. at 689. As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless preempt state law to the extent that the one conflicts with the other. This is "conflict preemption." Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Guerra,* 479 U.S. at 281, 107 S.Ct. at 689 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

### A. *Implied Preemption: Occupation of the Field*

■ Because the Medicare Act itself does not explicitly deal with preemption, the parties seek to infer Congress' intent from the comprehensiveness of the Act. Plaintiffs argue that the federal regulation is so pervasive that Congress must have intended to preclude state supplementation. Defendants rely on the complexity of the legislation to draw the opposite conclusion: If Congress took the time and effort to draft such elaborate legislation, it surely would have included a clause denoting preemption if its intent was to preempt.

In attempting to demonstrate that Congress intended preemption, the plaintiffs offer two occupation-of-the-field arguments. The first looks to the scope of Congress' commitment to Medicare. Plaintiffs note the billions of dollars the federal

---

3. Plaintiffs rely heavily on the Supreme Court's decision in *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145 (1988), in which the Court held that a state statute regulating natural gas was preempted by federal law. *Schneidewind* is, however, distinguishable from the case at bar. The regulation of natural gas has a much firmer basis of Congressional power— under the Constitution's Commerce Clause— than does the regulation of public health and welfare. The latter lies historically within the state sphere.

government spends on Medicare and the program's "exclusively federal nature." In their second argument, the plaintiffs assert that Congress left no room for state legislation of balance billing when it enacted such an elaborate and pervasive Medicare statute. The intricate detail of the statute and its recent amendments, plaintiffs contend, reveal that Congress intended the fine tuning of billing procedures be performed by Congress—not by the states.

While both of plaintiffs' arguments have surface appeal, neither is convincing. As the Third Circuit Court of Appeals observed in *Marconis*, Congress appropriates large sums of money to many programs without intending preemption. 942 F.2d at 850. For example, although Congress distributes large sums for highway construction, traffic regulations remain primarily state matters. *Id.*

Health care regulations have also been, as a matter of tradition, primarily state matters. The fact that Congress passed an elaborate law governing health care is not enough to uproot that tradition. Plaintiffs' effort to use the bill's complexity as a springboard to displacement is unconvincing. They must show a clear and manifest purpose to preempt; merely exploring the exact contours of the bill does not suffice. "[T]he subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." *Hillsborough County v. Automated Medical Labs*, 471 U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985). In the absence of an express provision indicating Congress' desire to preempt, I decline to let the breadth of the federal act strip the state of its power to legislate.

Such an outcome is further compelled by the Act's own language. To use the Act's scope and complexity as evidence of a Congress bent on extending federal power, as the plaintiffs seek to do, is to disregard the many instances where Congress has conveyed the very opposite intention. Congress repeatedly concedes state sovereignty on health issues in the text, enumerating "the practice of medicine," "the manner in which medical services are provided," "the compensation" of any provider, and "the administration or operation" of any health care provider as areas in which it does not purport to control or supervise. 42 U.S.C. § 1395. *Accord, Massachusetts Medical Society v. Dukakis, supra*, 815 F.2d at 791 ("The first section of the Medicare Act explicitly states the contrary intent to minimize federal intrusion into the [field of fee regulation of medical services for the elderly]"). The Act reveals Congress' intent not to preempt the role of the states in supplementing federal regulation, but rather an intent to preserve it.

In *Marconis*, both the district and circuit courts read meaning not only in what Congress said, but in what it did not say. The plaintiffs vehemently object to such an approach, noting the historical reluctance of courts to impute significance to silence. This caution is understandable. Attempting to find import in silence is frequently speculative.

But, as the Third Circuit noted in *Marconis*, this is an unusual situation with unambiguous Supreme Court precedent:

> The appellants [Pennsylvania Medical Society] cannot overcome the fact that, at the time of the Medicare amendments in 1989, and since then, Congress was and has been undisputedly aware of the fact that at least four states had balance billing restriction statutes and that similar restrictions had been considered by some 18 states.... This information was included in the PPRC report submitted to Congress in 1989. But in the face of this information, Congress did not include a specific preemption provision in the 1989 amendments to Medicare, nor has it done so since. The Supreme Court in a precedent we are not free to disregard has noted that when Congress remains silent regarding the preemptive effect of its legislation on state laws it knows to be in existence at the time of such legislation's passing, Congress has failed to evince the requisite clear and manifest purpose to super-

sede those state laws. *California Fed. Savings & Loan Ass'n v. Guerra,* 479 U.S. at 287–88, 107 S.Ct. at 692–93. Furthermore, in this case the silence is particularly indicative of congressional intent, given the extraordinary oversight of the Medicare program as evidenced by the very existence of the PPRC with its annual reports to Congress and by the frequent amendment of the Medicare Act. Congress has simply not preempted state balance billing restrictions.

942 F.2d at 850.

Massachusetts prohibited balance billing in 1985 and its power to do so was upheld by the First Circuit in 1987. *Massachusetts Medical Society v. Dukakis, supra.* Yet Congress declined to preempt explicitly, even as it was further amending Medicare in subsequent years.

These facts make Congress' silence significant. Congress affirmatively considered the interaction of the state and federal laws on balance billing and failed to act. This silence strongly supports the inference that it did not intend to displace state regulation.

Defendants and *amici* urge this Court also to attach significance to a statement in the House Ways and Means Committee Report prepared before the Medicare Act was passed. If truly representative of Congress' intentions on preemption, the statement expressly underscores federal reluctance to preclude state regulation: "The Committee intends that nothing in this section would prejudice the right of any State to require assignment on Medicare claims as a condition of licensure in the State." H.R. Report No. 247, 101st Cong., 1st Sess. 1008 (1989), *reprinted* in 1989 U.S.Code & Cong.Admin.News 1906, 2479 (App. 164). Plaintiffs insist that this "snippet of legislative history" be given no weight at all. Because Congress never adopted the passage in the bill, and even the Committee Report was superseded by a Conference Report that did not incorporate the comment, they urge me to discount the statement completely.

Plaintiffs have the better of this argument. Despite the Circuit Court's opinion in *Marconis,* I decline to attribute value to a comment issued only at the beginning of the bill's long journey to final adoption. All that can be said about the comment is that it was not approved by the entire Congress. Justice Scalia has persuasively observed the pitfalls of relying on small bits of legislative history:

> As anyone familiar with modern-day drafting of congressional committee reports is well aware, the references ... were inserted, at best by a committee staff member on his or her own initiative, and at worst by a committee staff member at the suggestion of a lawyer-lobbyist; and the purpose of those references was not primarily to inform the Members of Congress what the bill meant ... but rather to influence judicial construction. ...

*Blanchard v. Bergeron,* 489 U.S. 87, 98–99, 109 S.Ct. 939, 946–47, 103 L.Ed.2d 67 (1989) (concurring opinion).[4]

The Third Circuit in *Marconis,* however, was impressed by the uniqueness of the Committee passage. "[T]his is the only legislative statement of which we are aware clearly indicating congressional intent regarding preemption and it strongly indicates that preemption was not intended." 942 F.2d at 851. I do not agree. The statement may express preemption disapproval but, at least in my view, it does not express Congress' disapproval. Therefore, like the district court in *Marconis,* 755 F.Supp. at 1310 n. 1, I find the statement insignificant for the purposes of judicial construction.

Even without the support of the Committee statement, however, defendants have easily rebutted plaintiffs' arguments on implied preemption. Plaintiffs have not met the applicable legal standard: They have failed to show compelling evidence of a clear and manifest purpose by Congress to occupy the field of Medicare billing procedures. Therefore, Chapter 572 is not impliedly preempted by the Medicare Act.

4. The majority opinion did not address the specific concerns raised by Justice Scalia.

## B. *Conflict Preemption: Obstacle to Federal Purpose*

Conflict preemption requires a state law to be struck down if (1) it is impossible to comply with both the federal and state statutes, or (2) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Guerra,* 479 U.S. at 281, 107 S.Ct. at 689. Because physicians can comply with both the New York and federal statutes, the first prong of conflict analysis is not applicable.

The case at bar implicates the second prong. The plaintiffs contend that the overriding purpose of Congress in its regulation of balance billing was to strike a careful and precise balance among competing objectives. The Medicare Act represents Congress' effort both to provide beneficiaries with medical services they can afford, and to allow access to physicians who charge higher fees commensurate with their experience and ability. The balance billing scheme is thus a kind of "safety valve."

Plaintiffs argue that Chapter 572 turns this safety valve tighter than Congress intended. By limiting the amount physicians can charge below the federal level, New York has upset the balance assigned by Congress. Plaintiffs assert that if Congress had believed tighter restrictions were necessary, it would have enacted such restrictions.

The flaw in this argument is the assumption that Congress' safety valve was meant to bind each and every state. Congress did, to be sure, strike a careful balance between affordability and access. Congress' "purposes and objectives" clearly included defining a mix for the nation that would prevent doctors from abandoning Medicare patients, while also containing costs.

But there is no evidence that the design of Congress encompassed national uniformity. As has already been discussed, Congress left room for the states to regulate physician costs. The fact that Chapter 572 does not precisely conform with the Medicare Act is not itself enough to warrant preemption.[5] As the district court stated in *Marconis,* "[w]hether it is wise to stop the federal government from closing all 'safety valves' throughout the nation, is of course, an entirely different question from whether it is wise to *prevent states from closing one safety valve where it would serve the local interest."* 755 F.Supp. at 1312.

There is no reason to ascribe to Congress the desire to disturb New York's fee structure. Congress may have struck a delicate balance but, without more compelling evidence, I will not impose that balance upon the state of New York. Because Chapter 572 does not "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," I reject plaintiffs' preemption challenge.

## II. Due Process

Plaintiffs assert two Due Process claims. They argue (1) that Chapter 572 is void for vagueness and (2) that the absence of any requirement of *scienter* renders Chapter 572 unconstitutional.

### A. *Vagueness*

In *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972), the Court held that "an enactment is void for vagueness if its prohibitions are not clearly defined." To render an enactment "vague," a court must ascertain whether or not the statute "gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.*

When the statute in question is civil rather than criminal, the threshold required to make a finding of "vagueness" is a more stringent one. *Village of Hoffman Estates, Inc. v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186,

---

5. It is noteworthy that in the two circuit cases rejecting preemption, *Massachusetts Medical Society* and *Marconis,* the state statutes at issue completely prohibited balance billing. In the case at bar, the New York statute permits balance billing—but at slightly lower levels than the Medicare Act.

1193–94, 71 L.Ed.2d 362 (1982). To invalidate a civil statute, a reviewing court must find that "no standard of conduct is specified at all." *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971).

■ Chapter 572 surely specifies a standard of conduct: a fee in excess of "the reasonable charge for that service as determined by the United States secretary for health and human services." Medicare physicians have access to a report from the local Medicare carrier that details the "customary" and "prevailing" charges[6] for a given medical service. Mongiardo Aff. Ex. F. A physician of ordinary intelligence can then calculate the statutory cap on balance billing.

Even if special factors are present that require adjustment of the reasonable charge, this is the exceptional case. And when such an occasion arises, there is still a standard of conduct that is easily understood. A physician can obtain the new figure with little effort.

There is plainly no set of facts that could invalidate this law for vagueness. The standard is unambiguously set forth by Chapter 572 and is not "impermissibly vague in all of its applications." *Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. at 1191. Plaintiffs' vagueness challenge is therefore rejected.

B. *Scienter*

■ The plaintiffs assert that Chapter 572 is unconstitutional due to the lack of a *scienter* requirement. The need to show that an individual has an "evil-meaning mind with an evil-doing hand," *Morissette v. United States,* 342 U.S. 246, 251, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952), is indeed a fundamental tenet of our judicial system.

Not all offenses, however, require *scienter.* It is not necessary if the case involves an offense against the state's authority and if (1) "The accused ... usually is in a position to prevent it with no more care than society might reasonably expect and

no more exertion than it might reasonably expect from one who assumed his responsibilities," and (2) "penalties commonly are relatively small and conviction does no grave danger to an offender's reputation." *Id.* at 255–56, 72 S.Ct. at 246.

Chapter 572 meets these requirements. It is unquestionably a regulatory measure designed to achieve "some social betterment rather than the punishment of the crimes as in cases of *mala in se. " United States v. Balint,* 258 U.S. 250, 252, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922). The law aims to provide quality medical care to the elderly and disabled, regardless of financial ability. Physicians can obtain the reasonable charge easily, and violation of the statute carries a relatively small penalty: a maximum fine of $5,000 for repeat offenders. Because the law does not run afoul of any *scienter* requirement, I reject plaintiffs' constitutional challenge.

### CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment is denied and defendants' cross-motion is granted.

The Clerk of Court is directed to dismiss the complaint with prejudice.

It is SO ORDERED.

---

6. These are two components of the reasonable charge figure. The third is the actual charge,

which the physician obviously knows. *See supra* note 1.