**NEW YORK STATE SOCIETY OF ORTHOPAEDIC SURGEONS, INC. et ano., Plaintiffs,**

**v.**

**Jane GOULD, etc., et alia, Defendants.**

No. CV–91–1133.

United States District Court, E.D. New York.

June 3, 1992.

**68**

Martin Schaum, Schaum & Wiener, Garden City, N.Y., for plaintiffs.

Brian T. McGovern and Robert Abrams, Atty. Gen. State of N.Y., New York City, for defendants.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

Plaintiffs move and defendants cross-move for summary judgment with respect to the constitutionality of New York Public Health Law § 19. For the reasons discussed below, plaintiffs' motion is denied, and defendants' cross-motion is granted.

Plaintiff the New York State Society of Orthopaedic Surgeons, Inc. ("NYSSOS") is a non-profit corporation, pursuing the common interests of its membership. Plaintiff Green is a licensed physician and past president of NYSSOS. Defendants are state officials who have responsibility for enforcing the challenged statute.

Plaintiffs contend that New York Public Health Law § 19 runs afoul of three provisions of the United States Constitution: the due process clause, the supremacy clause, and the equal protection clause. Defendants argue that section 19 is a constitutionally acceptable exercise of the state's police powers. Judge Haight has recently rejected nearly identical due process and supremacy clause challenges to section 19. *See Medical Soc. of State of New York v. Cuomo*, 777 F.Supp. 1157 (S.D.N.Y.1991). That case is currently on appeal.

Section 19 limits the amount that licensed physicians can charge patients who benefit from Medicare, 42 U.S.C. § 1395 *et seq.* Specifically, the section limits physicians to 115% of the "reasonable charge" for a procedure as determined by the Secretary of Health and Human Services. Pub. Health Law § 19(1)(a). Beginning in 1993, that amount could fall to 105%. *Id.* § 19(1)(b).

A physician's disregard of the statute, in theory at least, may result in punishment. First offenders are liable for a fine of not more than $1,000 and not less "than the greater of three times the amount collected, or, if not collected, three times the amount charged, in excess of the limita-

tions" set forth above. *Id.* at § 19(4). Second offenders are liable for fines up to $5,000. *Id.* All offenders must refund to the Medicare beneficiary the amount of the overcharge. *Id.*

Background to this controversy includes the Medicare Act (the "Act") itself. The Act provides supplemental medical insurance to the aged and certain disabled individuals. Part B of the Act, 42 U.S.C. §§ 1395j–1395w–4, establishes a "voluntary individual insurance plan"; participants pay premiums that the federal government matches. *See Turecamo v. Commissioner of Internal Revenue*, 554 F.2d 564, 571–72 (2d Cir.1977). This case concerns Part B payments under the Medicare statute.

Part B obligates the federal government in most circumstances to pay 80% of a "reasonable charge" for a service. 42 U.S.C. § 1395u(b)(3)(B). The beneficiary owes the remainder.

Public Health Law section 19 essentially attempts to reduce the size of this remainder.

The size of the remainder varies depending on how a physician bills. The Act permits physicians (and others) to bill for their services in one of two ways: accepting "assignment" or on the basis of an "itemized bill" (which in the vernacular is called "balance billing"). 42 U.S.C. § 1395u(b)(3)(B)(i) & (ii). A physician who accepts assignment agrees to consider the reasonable charge full compensation for services provided. 42 U.S.C. § 1395u(b)(3)(B)(ii)(I). In contrast, physicians who balance bill can charge in excess of that amount.

The different methods of billing create different liabilities for the beneficiary. When a physician bills on assignment, she or he submits the bill directly to Medicare (or an insurance carrier operating under contract with Medicare), which pays the doctor directly. When the physician balance bills, however, the Medicare beneficiary is billed; the beneficiary then seeks reimbursement from Medicare. More significantly, as Medicare typically picks up only 80% of the reasonable charge, the beneficiary is ultimately responsible for the rest. While in all instances the beneficiary must pay the additional 20%, where a physician balance bills, the beneficiary must also pay the amount by which the bill exceeds the reasonable charge.

In part to protect Medicare beneficiaries, Congress has, by various methods, attempted to discourage balance billing. One such method, like section 19, limits the size of a balance bill to a certain percentage above a "recognized payment amount," 42 U.S.C. § 1395w–4(g). As of January 1, 1992, the recognized payment amount is determined by the same "fee schedule" used to establish a reasonable charge. 42 U.S.C. § 1395w–4(g)(2)(D). Another method provides certain benefits to physicians who agree each year to take all Medicare cases on assignment, called "participating physicians." 42 U.S.C. § 1395u(h).

Against this statutory background both sides move for summary judgment. Summary judgment must be granted if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The showing needed on summary judgment reflects the burden of proof in the underlying action. The court must consider "the actual quantum and quality of proof" demanded by the underlying cause of action and which party must present such proof, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), which in this case is the plaintiff. The Court may rely on affidavits made on personal knowledge, which are sufficient to establish the existence of facts attested to if opposing affidavits are not offered. Fed.R.Civ.P. 56(e).

Plaintiffs first contend that section 19 is unconstitutionally vague. In particular, plaintiffs cite *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926)):

> "[T]he terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render

them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

The statute invalidated in *Lanzetta* criminalized membership in a "gang," defined only as "two or more persons."

■ While section 19 would undoubtedly pass muster under the *Lanzetta* standard, it enjoys even more deferential review. The fact that the statute at issue in the instant action imposes civil penalties demands that the court treat it with "greater tolerance" than it would a criminal statute such as that presented in *Lanzetta*. *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982). And as this action challenges the statute on its face rather than as applied, the plaintiffs must demonstrate that the law "is impermissibly vague in all of its applications." *Id.* at 497, 102 S.Ct. at 1192–93. "In reviewing a business regulation for facial vagueness, ... the principal inquiry is whether the law affords fair warning of what is proscribed." *Id.* at 503, 102 S.Ct. at 1195–96.

■ Section 19 provides fair warning. It clearly states the maximum that a physician may charge: 115% "of the reasonable charge for that service as determined by the United States secretary for health and human services." Pub. Health Law § 19(1)(a).

Plaintiffs contend that determining the reasonable charge involves complex mathematics, which presumably they are unable to perform. However, while perhaps tedious, the calculations are hardly difficult. After January 1, 1992, payment based on a "reasonable charge" consists of the lesser of the actual charge for the service, or the amount determined under a fee schedule. 42 U.S.C. § 1395w–4(a)(1). The fee schedules must be based on the "relative value of the service," a "conversion factor," and a "geographic adjustment factor." 42 U.S.C. § 1395w–4(b)(1). The individual physician need not engage in these calculations, however. Rather the fee schedules are established by the Secretary of Health and Human Services. *Id.* While the Secretary of HHS thus might have his work cut out for him in establishing the fee schedules, the New York physician's task is far less complex: he or she must simply multiply the schedule amount, as set forth by the Secretary, by 115% to ascertain the maximum allowable charge under section 19.

Nor need physicians worry that the Secretary will keep the fee schedules hidden. The Medicare Act obligates insurance carriers under contract with Medicare to disseminate this information. *See* 42 U.S.C. § 1395u(b)(3)(G). Moreover, under the Act, the Secretary of Health and Human Services must send to "each physician furnishing physicians' services under this part ... information on fee schedule amounts that apply for the year ... for participating and non-participating physicians, and the maximum amount that may be charged consistent with subsection (g)(2) of this section." 42 U.S.C. § 1395w–4(h). Physicians simply do not, as plaintiffs intimate, operate in the dark.

Although plaintiffs do not raise the issue directly, I note that a physicians' task will not grow more complex in the future. On January 1, 1993 section 19 further limits physician's charges to either 110% or 105% of the reasonable charge, depending on the rate of increase of the statewide percentage of medicare claims billed at or below the reasonable charge. Pub. Health Law § 19(1)(b). Again, no individual physician need look to the underlying data to calculate a charge. The law requires the state office for the aging to report on whether the stated condition comes to pass on December 1, 1991. Thus the law creates a mechanism to inform physicians of the maximum percentage they can charge. All the physician must do is apply that percentage in an individual case. Physicians cannot justifiably complain that this elementa-

ry arithmetic function constitutes an "extremely complex calculation[ ]." Plaintiffs' Memo. of Law 5.

Plaintiffs also point out that section 19 penalizes inadvertent mistakes as well as intentional and bad-faith overbilling. In contrast, the federal Medicare statute penalizes "knowing and wilful" violations of the Act. *See* 42 U.S.C. § 1395u(j)(1)(A).

While a "scienter requirement may mitigate a law's vagueness," *Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. at 1193–94, a law may also speak clearly without it. *Cf. Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966). Section 19 does not admit of any ambiguity, and thus the likelihood of a reasonably intelligent doctor inadvertently overbilling appears small. (Parenthetically, it may be noted that the state agent charged with administering section 19 has stated under oath that currently no money exists to enforce the program, Mongiardo Aff. ¶¶ 2 & 16, and that the agency "does not expect to prosecute physicians who inadvertently violate" the law. *Id.* at ¶ 17.) The bona fides of a physician may be tested at an administrative hearing, later subject to judicial review. *Id.* at 18. "In evaluating a facial challenge to a state law, a federal court must, of course, consider any limited construction that a state court or enforcement agency has proffered." *Hoffman Estates*, 455 U.S. at 494 n. 5, 102 S.Ct. at 1191 n. 5 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972)).

Accordingly, the statute is not unconstitutionally vague.

Plaintiffs next contend that section 19 violates the Supremacy Clause because the federal Congress has occupied the field and set forth proper billing amounts and penalties for overcharging.

Other federal courts have already rejected this argument. In addition to Judge Haight, Massachusetts, *see Massachusetts Med. Soc. v. Dukakis*, 637 F.Supp. 684 (D.Mass.1986), *aff'd*, 815 F.2d 790, *cert. denied*, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987), and Pennsylvania, *see Pennsylvania Medical Society v. Marcon-*

*is*, 755 F.Supp. 1305 (W.D.Pa.1991), *aff'd*, 942 F.2d 842 (3d Cir.1991), federal courts have refused to strike down state statutes that go further than Congress in regulating Medicare billing practices.

"Congress may pre-empt state authority by so stating in express terms.... Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be found from a ' "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the State to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose." ' ... Even where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' ... or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' "

*Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n.*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983) (citations omitted).

Plaintiffs concede that Congress did not expressly pre-empt state law. Instead, they contend that Congress has acted so as to leave no room for further legislation by the various states, and that physicians cannot comply with both state and federal law.

In arguing for implicit preemption in a case such as this plaintiffs face "an uphill battle." *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 714, 105 S.Ct. 2371, 2375–76, 85 L.Ed.2d 714 (1985). Federal courts must indulge a "presumption that state or local regulation of matters related to

health and safety is not invalidated under the Supremacy Clause." *Id.* at 715, 105 S.Ct. at 2376. *See also Rebaldo v. Cuomo,* 749 F.2d 133, 138 (2d Cir.1984) (containment of hospital costs within states's police power), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985); *Medical Society,* 777 F.Supp. at 1160–61 (public health and cost of medical care traditional state functions) (collecting cases). Where the states, acting within their police powers, have "traditionally occupied" a field, only evidence that Congress had a "clear and manifest purpose" of displacing the states will overcome that presumption. *Id.* (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)).

Plaintiffs apparently argue that the breadth of Congress' Medicare enactments and the frequency with which it has visited the topic indicate that it has crowded out the states. Plaintiffs point to the many occasions on which Congress has in some fashion addressed physicians' recovery under Medicare, employing such methods as freezing fees, Deficit Reduction Act of 1984, Pub.L. 98–369, 98 Stat. 494, 42 U.S.C. § 1395u(b)(4)(B), establishing maximum allowable charges, Omnibus Budget Reconciliation Act of 1986, Pub.L. 97–35, 95 Stat. 357, 42 U.S.C. § 1395u(j)(1), creating the Physician Payment Review Commission, 42 U.S.C. § 1395w–1(b), and other means.

■ The fact that the statute is so complex as to approach being comprehensive does not, by itself, oust state regulation. *Hillsborough County,* 471 U.S. at 717, 105 S.Ct. at 2377. "The subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." *New York State Dept. of Social Servs. v. Dublino,* 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973) (quoted in *Hillsborough County,* 471 U.S. at 717, 105 S.Ct. at 2377). The fact that Congress repeatedly returned to the issue does not alter the analysis: Congress' continued effort "to meet the need"

does not exclude the states. *Hillsborough County,* 471 U.S. at 717, 105 S.Ct. at 2377.

Other than the sheer amount of Congressional attention to Medicare in general and its costs in particular, plaintiffs present no evidence that Congress at any time intended to divest the states of a function traditionally relegated to them.

To the contrary, Congress has accepted and even encouraged state participation in Medicare in both a general and specific sense. Judge Van Graafeiland, speaking of federal authorization for state experimental programs, has described Medicare as an example of "cooperate federalism." *Rebaldo,* 749 F.2d at 140. *Cf. Harris v. McRae,* 448 U.S. 297, 308–09, 100 S.Ct. 2671, 2683–84, 65 L.Ed.2d 784 (1980) (Medicaid). Judge Haight has also noted "the many instances" in which the Act expressly recognizes the contribution of the states, and by which "Congress repeatedly concedes state sovereignty on health issues in the text" of the Act. *Medical Soc.,* 777 F.Supp. at 1162.

In particular, authority to regulate fees remains, in part at least, with the states. Congress' refusal expressly to preempt enjoys special significance. In 1985 Massachusetts proscribed certain Medicare billing practices even more dramatically than has New York by denying physicians the opportunity to balance bill. The federal district court and First Circuit both upheld the state law against a preemption challenge. *See Massachusetts Med. Soc. v. Dukakis,* 637 F.Supp. 684 (D.Mass.1986), *aff'd,* 815 F.2d 790 (1st Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). Although confronted with the Massachusetts law and the knowledge that other states might move to cap Medicare balance billing, *see Marconis,* 942 F.2d at 850 (3d Cir.1991); *see generally Impact of State Mandatory Assignment Programs on Beneficiaries: GAO Report to the Chairman, House Subcomm. on Housing and Consumer Interests, Select Comm. on Aging* (Sept.1989), Congress did not preempt. Whatever criticism might generally be leveled against attempts to search for legislative intent in Congressional inaction, the

Third Circuit and, in turn, Judge Haight, have pointed out that the Supreme Court has paid special attention to inaction where preemption is concerned. *See Marconis,* 942 F.2d at 850; *Medical Soc.,* 777 F.Supp. at 1162–63 (quoting *Marconis* ). Where "Congress was aware of state laws" that implicated a federal statute but remained silent, Congress has "failed to evince the requisite 'clear and manifest purpose' to supercede them." *California Fed. Sav. & Loan Assn. v. Guerra,* 479 U.S. 272, 287–88, 107 S.Ct. 683, 692–93, 93 L.Ed.2d 613 (1987).

The language of the Act itself also demonstrates that Congress did not intend to push the states to the sidelines with regard to physicians' fees. The Act states: "Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine ... or over the ... compensation of any ... person providing health services." 42 U.S.C. § 1395. In light of this self-imposed limitation on federal power, it is fair to say that when the federal government limits recovery under Medicare it acts primarily (although certainly not exclusively) to protect the public fisc from excessive claims. *See Szekely v. Florida Med. Assn.,* 517 F.2d 345, 350 (5th Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). By means of section 19, New York has sought to protect the amount of money that its citizens must ultimately pay for health care, clearly the sort of power reserved for the states under 42 U.S.C. § 1395. Ironically, this point would be clearer if New York had imposed a harsher penalty—loss of a license—for violations of section 19, for that would appear an obvious exercise of supervision and control over the practice of medicine. Similarly, the fact that New York has capped only the cost of health care to Medicare beneficiaries who end up paying more than a 20% co-payment, rather than to all patients, does not alter the analysis: it simply reflects a state judgment to provide additional protection for a group that is often particularly at risk due to expensive medical care.

Although Congress has not fully occupied the field, plaintiffs nevertheless contend that they cannot comply with both state and federal billing rules. Plaintiffs argue that under state law physicians run the risk of penalization for conduct that federal law considers acceptable.

The mere fact that federal law permits an act does not necessarily mean that state proscription of it is incompatible with the federal enactment. *See Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 131, 98 S.Ct. 2207, 2216–17, 57 L.Ed.2d 91 (1978); *Marconis,* 942 F.2d at 853; *Stern v. General Elec. Co.,* 924 F.2d 472, 476 (2d Cir.1991). This is not a situation where federal law *requires* doctors to bill at more than 115% of the reasonable charge for any given service. Additionally, plaintiffs have submitted no evidence suggesting that Medicare creates some "affirmative 'right' " to balance bill at a certain rate. *See Motor Vehicle Assn. v. Abrams,* 899 F.2d 1315, 1323 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). Medicare merely recognizes balance billing, with certain limitations, as one means of billing that the federal government considers acceptable. The state disagrees, and finds such billing unacceptable when it grows too costly. "[F]or preemption to occur ... there must be more than mere differences between the state and federal regulatory systems; rather, compliance with the two must be a 'physical impossibility.' " *Motor Vehicle Assn.,* 899 F.2d at 1322 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). So long as physicians comply with section 19's limitation on how much they charge, they will not run afoul of federal law regarding who to bill or the amount of the federal contribution. In *Motor Vehicle Association* the Second Circuit upheld a state "lemon law" that afforded consumer's greater protection than did various federal laws and regulations. Similarly, here the state has sought to provide consumers of medical care greater protection than has the federal government.

The fact that both laws attempt to achieve the same goal provides more evidence that they are not in "conflict." A conflict may arise where state regulation "frustrate[s] the attainment of specific objectives that federal legislation is designed to promote." *Stern*, 924 F.2d at 476. The corollary states that preemption is "particularly inappropriate" where the state and federal legislation share the same "basic purpose." *See Exxon Corp.*, 437 U.S. at 132–33, 98 S.Ct. at 2217–18 (no preemption where both state and federal law endeavored to favor equal treatment of customers over sellers' freedom to make selective competitive decisions). Where the broad goals of the legislation are the same, differences in the detail or the mechanism for implementing the legislation's goal do not implicate the supremacy clause. *See Motor Vehicle Assn.*, 899 F.2d at 1323. Here it is beyond dispute that, in general, both statutes seek to provide affordable health care to the elderly. The mere fact that the federal code permits a greater amount of balance billing than does the state law does not reflect a desire to encourage that practice as a national policy. *See Stern*, 924 F.2d at 476. Indeed, as outlined earlier in this opinion, Congress has treated balance billing with increasing skepticism.

 Plaintiffs third challenge to the statute rests on the Fourteenth Amendment's equal protection clause, which commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. Under the equal protection clause, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

Plaintiffs state that New York statute impermissibly singles out and restricts the billing fees charged by physicians, as distinct from other health care providers. They then assert, without discussion, that this scheme "is not rationally related to a governmental purpose."

The purpose here is both obvious and legitimate. Defendants' counsel has placed before the Court extensive evidence regarding section 19's legislative history. That history identifies the purpose of the legislation with one voice: limiting Medicare beneficiaries' health care costs. *See, e.g.,* Governor's Memorandum of Approval, July 18, 1990. The plaintiffs, as doctors, certainly do not dispute that the state has a legitimate interest in ensuring that its citizens receive affordable medical treatment.

The plaintiffs' opposition thus appears targeted at the relationship between this objective and section 19. As plaintiffs raise an equal protection challenge, the important question is whether there is a rational relationship between a law that caps physicians fees, while leaving other members of the medical community free to charge as they please.

The fact that physicians' balance billing accounts for a large majority of the added costs to Medicare beneficiaries demonstrates that the statute bears a rational relationship to the need. The GAO study found that physicians' services account for some 72% of relevant Medicare expenditures. *See GAO Report, supra,* at 8 n. 2. A state legislature "need not 'strike at all evils at the same time or in the same way,' ... [but instead] 'may implement [its] program step by step, ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981) (citations omitted). Here the state legislature "could rationally have decided," *id.,* that the size of physicians' bills presented a compelling case, and that it lacked sufficient evidence on the costs levied against state citizens by non-physician health care providers.[1]

Accordingly the plaintiffs' motion is denied and the defendants' motion is granted. Defendants are directed to settle a judg-

---

1. I also note that in its focus on physicians section 19 mimics the Medicare Act, which plaintiffs do not challenge on equal protection grounds. *See, e.g.,* 42 U.S.C. § 1395w–4(g).]

ment on notice within thirty days of the date hereof.

SO ORDERED.